**STATE OF ALABAMA ex rel. William J. BAXLEY, as Attorney General of the State of Alabama, Plaintiff,**

v.

**TENNESSEE VALLEY AUTHORITY, Aubrey J. Wagner as Chairman of the Board of Directors of the TVA, et al., Defendants.**

**Civ. A. No. 77–M–0377.**

United States District Court,
N. D. Alabama, Northwestern Division.

Jan. 25, 1979.

Charles A. Graddick, Atty. Gen., Edward E. Carnes, Asst. Atty. Gen., Montgomery, Ala., for plaintiff.

Herbert S. Sanger, Jr., Gen. Counsel, Charles A. Wagner, III, Assoc. Gen. Counsel, Justin M. Schwamm, Assoc. Gen. Counsel, Michael R. McElroy, TVA, Knoxville, Tenn., for defendants.

## MEMORANDUM OPINION

McFADDEN, Chief Judge.

The State of Alabama, on the relation of its Attorney General, in this action against the Tennessee Valley Authority, and its board of directors (TVA), seeks a declaration that Section 8(a) of the Tennessee Valley Authority Act, 16 U.S.C. § 831g(a), requires TVA to locate its administrative and executive offices at Muscle Shoals, Ala-

bama, and an injunction restraining TVA from maintaining such offices at a place other than Muscle Shoals. Jurisdiction exists under 28 U.S.C. § 1331.

Pending before the court are cross-motions for summary judgment. The issues raised by these motions are whether Alabama has standing to bring this action, whether the suit is barred by the doctrine of res judicata, and finally, whether section 8(a) of the Act requires TVA to locate its main offices at Muscle Shoals, Alabama.

## I. *STANDING*

Alabama alleges that it has standing to bring this action in both its proprietary capacity, and in its representative capacity as *parens patriae* for its citizens.

A. The State as *Parens Patriae*.

TVA first contends that *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), denies Alabama standing, in its *parens patriae* capacity, to sue a federal agency:

> While the state, under some circumstances, may sue for the protection of its citizens, . . . it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae.*

*Id.* at 485–86, 43 S.Ct. at 600. *Accord South Carolina v. Katzenbach,* 383 U.S. 301, 324, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); *Com. of Pa. by Shapp v. Kleppe,* 174 U.S. App.D.C. 441, 533 F.2d 668 (1976), *cert. denied* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976).

In both *Mellon* and *Katzenbach,* the plaintiff states challenged the constitutionality of federal statutes. Standing in t .ose circumstances would be "clearly and obviously a fundamental threat to the federal sovereign power." *Com. of Pa. by Shapp v. Kleppe, supra,* 174 U.S.App.D.C. at 455, 533 F.2d at 682 (Lumbard, J., dissenting). Alabama, however, "seeks only to vindicate the will of the people as it has been expressed

by their duly elected representatives in the national legislature." *Id.* Therefore, the federalism considerations present in those actions are absent here. *Compare Georgia v. Pennsylvania R.R.,* 324 U.S. 439, 445, 65 S.Ct. 716, 89 L.Ed. 1051 (1945).

In *Washington Utilities & Transp. Com'r. v. F. C. C.,* 513 F.2d 1142 (9th Cir. 1975), *cert. denied* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975), the court found this distinction to be dispositive and held that a state, through one of its agencies, had *parens patriae* standing to challenge federal agency action:

> WUTC does not attack the constitutionality of the Communications Act on any ground; rather, it relies upon the federal statute and seeks to vindicate the congressional will by presenting what it asserts to be a violation of that statute by the administrative agency charged with its enforcement.

*Id.* at 1153.

Other cases support *parens patriae* standing in this case. In *State of Florida v. Weinberger,* 492 F.2d 488 (5th Cir. 1974), the court held that Florida, on behalf of its citizens, had standing to challenge the Secretary of HEW's power to enact certain regulations under the Medicaid Act, 42 U.S.C. § 1396a. In *State of New York v. United States,* 65 F.Supp. 856 (S.D.N.Y. 1946) (three-judge court), *affirmed* 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947), the court found that the state had standing as *parens patriae* to challenge an alleged misapplication of a federal statute by the Interstate Commerce Commission.

■ In the court's view the rationale of *Massachusetts v. Mellon, supra,* is not applicable to the facts in the present case and there is no constitutional barrier to Alabama acting as *parens patriae* for its citizens.

There is, however, an inherent limitation on the legitimacy of any action brought by a state as *parens patriae.* In *Pennsylvania v. New Jersey,* 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976), the court noted that:

It has, however, become settled doctrine that a State has standing to sue [as *parens patriae*] only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens. *Id.* at 665, 96 S.Ct. at 2336.

Quasi-sovereign interests are implicated where the injury for which redress is sought affects the general welfare of the state, or its citizens at large. *Kansas v. Colorado,* 206 U.S. 46, 99, 27 S.Ct. 655, 51 L.Ed. 956 (1907); *Louisiana v. Texas,* 176 U.S. 1, 19, 20 S.Ct. 251, 44 L.Ed. 347 (1900).

■ Alabama alleges that the location of TVA at Muscle Shoals would benefit the general welfare of its citizens and promote the economic well-being of the state by the creation of thousands of jobs in the Muscle Shoals area, and the injection of millions of dollars into the state economy. The court is of the opinion that these allegations are sufficient to support a finding of injury to the quasi-sovereign interests of Alabama.

B. The Proprietary Interests of the State.

Alabama's proprietary interests are alleged to have been harmed by the loss of tax revenues, the denial of a statutory right conferred by section 8(a), and the loss of honor and prestige resulting from the failure of TVA to locate its headquarters at Muscle Shoals.

A state has at least the same right of access to the court as any other institution to seek redress for injuries sustained in its proprietary capacity. *Com. of Pa., by Shapp v. Kleppe, supra.* *See also Hawaii v. Standard Oil Company of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 84 (1972).

■ The court agrees with the statement in *Com. of Pa., by Shapp v. Kleppe, supra,* 174 U.S.App.D.C. at 445, 533 F.2d at 672, that an "allegation that tax revenues were reduced embodies a comprehensible harm to the economic interests of the state government," and therefore is of the opinion that Alabama, in its proprietary capacity, has alleged a judicially cognizable claim for re-

lief. *Compare, Massachusetts v. Mellon, supra,* at 485. Since only injunctive and declaratory relief is sought, the court need not decide whether the alleged denial of a statutory right or loss of honor and prestige are redressable injuries.

### C. Constitutional and Prudential Limitations on Standing.

Having determined that the identity of the parties is no bar to the adjudication of the claims set forth in the complaint, consideration must now be given to those standing questions applicable to any suit brought in a federal court.

Under article III of the Constitution of the United States, the federal judicial power extends only to "cases" or "controversies". *Muskrat v. United States,* 219 U.S. 346, 356, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

In terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.

*Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

A recent exposition of the Supreme Court concerning the Article III requisites of standing is found in *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978):

The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). As refined by subsequent reformulation, this requirement of a "personal stake" has come to be understood to require not only a "distinct and palpable injury," to the plaintiff, *Warth v. Seldin,* 422 U.S. 490, 501, 95

S.Ct. 2197, 45 L.Ed.2d 343, but also a "fairly traceable" causal connection between the claimed injury and the challenged conduct. *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). See also *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Linda R. S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

*Id.* at 2630.

Prior to the submission of the pending motions, the court granted TVA's request for a protective order against answering interrogatories seeking to discover the number of persons employed by TVA and the dollar amount of the payroll allocable to them. TVA, however, has not disputed the factual allegations of the complaint, and properly recognizes that it is the *nature* of the claimed injury, and not the *amount* thereof which is relevant to the standing inquiry. *United States v. SCRAP,* 412 U.S. 669, 689, n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

It is common knowledge that the presence of the headquarters of an organization the size of TVA would generate tax revenues directly and indirectly to the state and have a significant economic impact on the state. Clearly, the absence of the jobs the headquarters would provide and money thereby generated from Alabama's economic system is a "direct and palpable injury" to its quasi-sovereign interest in the general welfare of its citizens.

■ The court finds, therefore, that Alabama, as *parens patriae* for its citizens, and in its own right as an entity possessing proprietary interests, has satisfied the "direct injury" test for standing under article III.

The other article III requirement for standing is a showing that there is "a 'substantial likelihood' " that the relief requested will redress the injury claimed." *Duke Power Co. v. Carolina Environmental Study Group, Inc., supra,* 98 S.Ct. at 2631 n. 20. See also, *Regents of the University of Cali-*

*fornia v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978). There is no doubt that a judicial decree requiring TVA to locate its headquarters at Muscle Shoals will result in the influx of jobs and dollars into the state economy, and will result in increased tax revenues for the state. The court is of the opinion that the "redressability" requirement has been met.

TVA has steadfastly asserted that Alabama must also demonstrate that its interests which have been injured are within the "zone of interests" meant to be protected by the TVA Act, citing *Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Some commentators have questioned the continued validity of the "zone of interests" test. *See, e. g.,* K. Davis, *Administrative Law of the Seventies,* § 22.02–11, at 184–187 (1978 Supp.); Sedler, *Standing Justiciability, and All That: A Behavioral Analysis,* 25 Vand.L.Rev. 479, 486 (1972). An analysis of the opinion in *Duke Power Co. v. Carolina Environmental Study Group, Inc., supra,* strongly suggests that that test has been abandoned. In *Duke,* the defendants argued that in order to have standing, the plaintiffs should have been required to demonstrate a connection between the rights being asserted and the injuries suffered. The court declined to apply a *Flast* -type nexus test and held:

> We . . . cannot accept the contention that, outside the context of taxpayers' suits, a litigant must demonstrate anything more than injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury to satisfy the "case or controversy" requirement of Art. III.

98 S.Ct. at 2634.

In the court's opinion, Alabama has satisfied the article III requirements for standing.

TVA's final objection to Alabama's standing to bring this action is that the injuries it complains of are no more than generalized grievances which are equally shared by all citizens of the United States, and therefore fall within the prudential limitations on the exercise of federal jurisdiction. *See Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974).

The Supreme Court, however, has recently de-emphasized the prudential limitations on the classes of persons who may properly challenge governmental action:

> Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met. (Citation omitted)

*Duke Power Co. v. Carolina Environmental Study Group, Inc., supra,* 98 S.Ct. at 2634.

Regardless of the weight to be given to general prudential concerns, it appears to the court that TVA has perhaps misconstrued the nature of the grievance asserted by Alabama. The fact that all national citizens have an idealogical interest in a federal agency's compliance with the law, *First National Bank v. Missouri,* 263 U.S. 640, 666–67, 44 S.Ct. 212, 68 L.Ed. 486 (1924) (Van Devanter, J. dissenting), does not preclude a readily identifiable portion of that citizenry from asserting a distinct and particularized harm. Alabama has shown interests which are sufficiently apart from a generalized interest in good government to overcome any duty on the part of this court to stay its hand on prudential grounds.

## II. *RES JUDICATA*

TVA has interposed the judgment of the court in *Frahn v. Tennessee Valley Authority,* 41 F.Supp. 83 (N.D.Ala.1941), as a bar to the present suit. In that case, an action was brought against TVA by citizens and taxpayers of the Muscle Shoals area, on

behalf of themselves and others similarly situated, seeking a declaration that TVA was violating section 8(a) of the TVA Act by not locating its general headquarters at Muscle Shoals.

Alabama maintains that *Frahn* does not preclude this action for two reasons: (1) the section 8(a) issue was not decided there, and (2) the State of Alabama was not a party to that case.

 The court in *Frahn* held that it lacked jurisdiction to interpret section 8(a) because the complaint failed "to present a justiciable controversy." 41 F.Supp. at 86. In reaching this conclusion the court found that the plaintiffs lacked standing to bring the action, and that the interpretation placed on section 8(a) by TVA was not so unreasonable as to require judicial interference. Alabama argues that the holding of non-justiciability encompasses only the lack of standing, and the finding that the interpretation of section 8(a) was committed to administrative discretion is dictum.

The court is of the opinion that this is true and that Judge Murphree's finding of lack of a justiciable controversy was based on the lack of standing. If plaintiffs lacked the standing to bring the action, the court's comments with respect to the statutory interpretation question were dictum. However, even if, as TVA contends, the decision was based on two grounds—standing and the lack of power to contest the discretion of the executive officers of the government in respect to the interpretation of the statutes—this action is not necessarily precluded by *Frahn.* Alabama could not be bound by that judgment under *res judicata* principles unless it was a party to the proceeding. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *State of Texas v. Chuoke,* 154 F.2d 1 (5th Cir. 1946), *cert. denied* 329 U.S. 714, 67 S.Ct. 45, 91 L.Ed. 620 (1946).

TVA does not pretend that Alabama was a named plaintiff in *Frahn,* but maintains that it should be bound by the judgment there because *Frahn* was a class action on behalf of all Alabama citizens. The court cannot accept this contention. Besides the absence of any indication that a plaintiff class was ever certified by the *Frahn* court, in the present action Alabama has sued on its own right, asserting injury to its proprietary and quasi-sovereign interests. The court is of the opinion that these interests are not so identical to those of the putative class of plaintiffs in *Frahn* as to make the judgment in that case a bar to the present proceedings even if the question was there decided. *Compare Dufee v. Duke,* 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963).

## III. THE "PRINCIPAL OFFICE" PROVISION OF SECTION 8(a)

Section 8(a) of the Tennessee Valley Authority Act of 1933, 16 U.S.C. § 831g(a), provides:

> The Corporation shall maintain its principal office in the immediate vicinity of Muscle Shoals, Alabama. The Corporation shall be held to be an inhabitant and resident of the northern judicial district of Alabama within the meaning of the laws of the United States relating to the venue of civil suits.

Alabama contends that this provision requires TVA to locate its administrative and operational headquarters at Muscle Shoals. TVA submits that section 8(a) only requires that it maintain an office to accept service of process at Muscle Shoals. This is essentially what TVA does, with its administrative and operational headquarters being maintained elsewhere, principally in Knoxville, Tennessee.

As a threshold matter, the court must deal with TVA's assertion that it has discretion to interpret the meaning of the principal office provision. The asserted TVA grant of discretion to choose the location of its headquarters is based on Section 3 of the Act, which authorizes the Board to:

> appoint such managers, assistant managers, officers, employees, attorneys, and agents as are necessary for the transaction of business . . . and provide a system of organization to fix responsibility and promote efficiency.

16 U.S.C. § 831b.

The court is not persuaded by this argument. In *Morton v. Ruiz,* 415 U.S. 199, 94

S.Ct. 1055, 39 L.Ed.2d 270 (1974), the court noted that the Secretary of the Interior had, by statute, been granted broad managerial authority over Indian affairs. *Id.* at 231 n. 26, 94 S.Ct. 1055. However, the court rejected the administrative interpretation of the statute in question, holding that in order for an agency interpretation to be granted deference it must be consistent with the congressional purpose. *Id.* at 237, 94 S.Ct. 1055.

The principle of judicial deference to the interpretation given a statute by those charged with its enforcement has long been recognized. *See, e. g., Red Lion Broadcasting Co. v. F. C. C.,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Zemel v. Rush,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Houghton v. Payne,* 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888 (1904). However, a court will not defer to the administrative construction where it is shown that such construction is not in accordance with the Congressional intent behind the statute. *Morton v. Ruiz, supra; Espinoza v. Farah Manufacturing Co., Inc.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973); *Houghton v. Payne, supra.* And where the dispute concerns the meaning of a statutory term as opposed to a policy decision requiring exercise of an agency's expertise, the courts will not abdicate their primary function of interpreting the law. *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960).

The phrase "principal office" is a legal term of art, and its correct interpretation is a matter for judicial determination. Congress is presumed to know the judicially established meaning of the words it uses in statutory provisions. *United States v. Merriam,* 263 U.S. 179, 44 S.Ct. 69, 68 L.Ed. 240 (1923).

The primary rule of statutory construction is to ascertain and effectuate the legislative intent. 2A Sands, *Sutherland Statutory Construction,* § 45.05, at 16 (4th ed. 1973). And where a statute is unambiguous, this can be accomplished by examination of the language adopted by the legislature. *Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

Alabama asserts that no ambiguity exists in the language of section 8(a), and that the term "principal office" clearly means the main headquarters of a corporation. *See, e. g., Peters v. Detroit & Cleveland Nav. Co.,* 24 F.2d 454 (W.D.N.Y.1927); *Caceres v. United States Shipping Bd. Emergency Fleet Co.,* 299 F. 968 (E.D.N.Y.1924); *Mason & Hanger Co. v. Sharon,* 231 F. 861 (2d Cir. 1916), *cert. denied* 241 U.S. 670, 36 S.Ct. 554, 60 L.Ed. 1230 (1916); Oleck, *Modern Corporation Law,* § 461, at 705 (1958). TVA, however, argues that the term "principal office," when used in the corporate context, refers to an address for service of process. There is some authority for this position. *See, e. g.,* 40 Op.Atty.Gen. 115 (1941); 18 C.J.S. *Corporations* § 177 (1939); 8 W. Fletcher, *Cyclopedia of the Law of Private Corporations* ¶ 4046, at 483–84 (1966); Oleck, *Modern Corporation Law, supra,* § 3, at 13.

■ The court, nevertheless, is of the view that the language of the statute is plain and unambiguous and that it clearly means the main headquarters of the corporation, particularly when read in conjunction with section 2(e) of the TVA Act, 16 U.S.C. § 831a(e), which provides:

Each of the members of the board shall be a citizen of the United States, and shall receive a salary at the rate of $10,-000 a year, to be paid by the Corporation as current expenses. Each member of the board, in addition to his salary, shall be permitted to occupy as his residence one of the dwelling houses owned by the Government in the vicinity of Muscle Shoals, Alabama, the same to be designated by the President of the United States. Members of the board shall be reimbursed by the Corporation for actual expenses (including traveling and subsistence expenses) incurred by them in the performance of the duties vested in the board by this Act [16 USCS § 831 *et seq.*]. No member of said board shall, during his continuance in office, be engaged in any

other business, but each member shall devote himself to the work of the Corporation.

82 C.J.S. *Statutes,* § 345, at 699–700 (1953), states:

In construing a statute, the intention or purpose of the legislature, or the meaning of a statute is to be determined, not from any single part, portion or section . . . or from particular or specific expressions or terms . . . but from a general consideration or view of the act as a whole or in its entirety. (Footnotes omitted)

And wherever reasonable, the court will adopt that construction which gives effect to all provisions of the statute. *Meltzer v. Board of Public Instruction of Orange County, Fla.,* 548 F.2d 559 (5th Cir. 1977); 2A Sands, *Sutherland Statutory Construction, supra,* § 46.06.

It is apparent to the court that the free residence provision of section 2(e) would be meaningless if section 8(a) were construed to allow TVA to locate its main headquarters at a place distant from Muscle Shoals.

Assuming, however, that the language is ambiguous, the legislative history preceding the enactment of the TVA Act of 1933 also points to the conclusion that Congress intended the headquarters of TVA to be located at Muscle Shoals.

The pre-enactment remarks of Senator Norris, the co-author of the TVA Act, clearly indicate that the free residence was intended to be a salary supplement for TVA directors:

I realize that there is very much disagreement as to whether we could get a man for $9,000 or $10,000 who could fill this place. I am of the opinion that we could. I do not believe there would be any difficulty. If a member of the board desires to live in Muscle Shoals—and I think it is a beautiful place to live—he would have his house rent free, in addition to his salary.

77 Cong.Rec. 2687 (1933).

Although never enacted into law because of Presidential veto, the Muscle Shoals Act of 1928, H.R. 7744, 70th Cong., 1st Sess. (1927), and the Muscle Shoals Act of 1931, S.J.Res.No. 49, 71st Cong., 3d Sess. (1931), both sought to establish the Muscle Shoals Corporation of the United States to oversee the federal government's investment in nitrate and electrical plants located at Muscle Shoals. Section 7(a) of both acts contained language identical to that which was eventually enacted as section 8(a) of the TVA Act of 1933.

Lister Hill was a member of the House Committee on Military Affairs which drafted the 1928 Act. H.R.Rep.No. 1095, 70th Cong., 1st Sess. (1928). He later testified concerning the purpose of the principal office provision:

The idea and the purpose of the committee in putting that language in the bill was that the actual headquarters, that those whose business it was to carry on the permanent work, to set the policies, to be the chiefs and the heads, should have their office at Muscle Shoals, Ala.

And in that connection, let me say that back in 1928 the Committee on Military Affairs of the House had a full picture of the situation, in many ways, just about as full as we have today, for this reason; that the engineers, the Army Engineers, at that time had completed the finest and most detailed survey of the Tennessee River that has ever been made of any river in the whole world, and we had that survey of the engineers before us at the time we put this language in the bill.

We knew what we were doing; we knew what we wanted to do. We had the facts that Senator Bankhead has given us this morning about the geographical importance; the fact that after all is said and done, Muscle Shoals is, so to speak, the center of gravity of any activity in that whole great valley.

All of the facts showed that Muscle Shoals was a logical place, that it was a feasible place, and that economy and efficiency dictated that the headquarters be placed there.

I was a member of the Committee on Military Affairs when that language was written into the bill. . . . *Hearings Before the Joint Committee on the Investigation of the Tennessee Valley Authority,* 75th Cong., at 5224 (1938).

Although the Muscle Shoals Act of 1928 was never enacted into law, given the identity of the language of its principal office provision to that of section 8(a) of the TVA Act, it is fair to infer that the comments of Representative Hill are equally applicable to both provisions. *Compare FEA v. Algonquin Sng., Inc.,* 426 U.S. 548, 652–64, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976). And since Senator Norris and Representative Hill were co-sponsors of the TVA Act, their statements are entitled to great weight, even though Alabama, represented by Representative Hill, stood to benefit from their reading of the statute. *Id.* at 564 n. 17, 96 S.Ct. 2295.

TVA places great reliance on the conclusion reached in the *Report of the Joint Committee on the Investigation of the Tennessee Valley Authority,* 76th Cong., 1st Sess. 9 (1939):

> The committee finds that the Authority has legally complied with that part of subsection (a) of section 8 of the act, as amended, which requires that the principal office of the Authority be maintained in the immediate vicinity of Muscle Shoals, Ala. However, on account of the substantial difference of opinion on the question, the committee recommends that, in view of the approaching completion of the dams, Congress give immediate consideration to clarifying the issue.

Three members of the nine-man committee disagreed with the majority report on this issue and concluded that TVA's maintenance of its headquarters in Knoxville was "a palpable violation of this mandatory provision of the TVA Act." *Id.* at 331.

The result reached by this committee, along with the fact that Congress has never amended section 8(a), argues TVA, constitutes express approval of its interpretation of the principal office provisions. The Supreme Court has noted, however, that "[t]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 348–49, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963), quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed. 334 (1960). *See also, Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

TVA further supports its argument that the administrative interpretation is in accordance with the Congressional intent by pointing out that Congress has continued to appropriate funds to maintain TVA offices not located in Muscle Shoals, and in fact has specifically refused to appropriate funds for the purpose of relocating TVA offices. Act of July 27, 1953, Ch. 241, 67 Stat. 190.

The Supreme Court, however, has recently cautioned against reliance on subsequent appropriation acts in determining the intent of the legislature which enacted the underlying statute. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 2299–2300, 57 L.Ed.2d 117 (1978). Moreover, the probative value of appropriation measures here diminishes in view of the fact that Congress has refused to pass proposed permanent amendments to section 8(a) which would have eliminated Muscle Shoals as the situs of the principal office. See S. 1207, 79th Cong., 1st Sess. (1945), and H.R. 4146, 83d Cong., 1st Sess. (1953).

As was noted earlier in this opinion, the long-standing administrative interpretation of section 8(a) is to be accorded great weight in seeking to determine the proper construction of the Act. But it is equally clear that it is not the controlling consideration:

> Contemporaneous and practical interpretation serves as another aid of statutory construction, and therefore must be weighed against the other factors pertinent to the determination of legislative intent.

2A Sands, *Sutherland Statutory Construction, supra,* § 49.04, at 235.

The court is of the view that the plain reading of the statute requires a finding that Congress fully intended the primary administrative and operational headquarters of TVA to be located in the Muscle Shoals area. The court is further of the view that even if the language were to be considered ambiguous, the employment of other means of statutory interpretation dictates the same result.

Accordingly, TVA's motion for summary judgment is due to be denied and that of the plaintiff granted.