**STATE OF LOUISIANA, et al.**

v.

**Colonel Robert C. LEE, et al.**

**Civ. A. No. 83–6126.**

United States District Court,
E.D. Louisiana.

Sept. 14, 1984.

Michael Osborne, New Orleans, La., Nicholas C. Yost, Washington, D.C., William J. Guste, Jr. Atty. Gen., Peter M. Arnow, Asst. Atty. Gen., Baton Rouge, La., for plaintiffs.

Fred E. Salley, William F. Baity, Asst. U.S. Atty., New Orleans, La., James T.B. Tripp, New York City, Joe LeBlanc, James A. Burton, New Orleans, La., for defendants.

## OPINION AND ORDER

McNAMARA, District Judge.

This litigation arises out of the five-year extension of six shell dredging permits issued by the U.S. Army Corps of Engineers (Corps) pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and the Clean Water Act, 33 U.S.C. § 1344. The permits allow four shell dredging companies to dredge in two areas of southern Louisiana. The "Gulf Coast Area", consists of the Gulf of Mexico, East and West Cote Blanche, Four League and Vermilion Bays. The "Lake Area", consists of Lakes Pontchartrain and Maurepas.

The Plaintiffs, comprised of the State of Louisiana and several private environmentalist groups [1], allege that the Corps violat-

---

1. The "private" Plaintiffs are Save Our Coast, Inc., The Orleans Audobon Society, Sierra Club, Manchac Fisherman's Association and the Environmental Defense Fund.

ed the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Three of the shell dredging companies subject to the permits—Louisiana Materials Co., Inc., Radcliff Materials, Inc. and Pontchartrain Materials Corp.—have intervened as defendants. The Complaint seeks: (1) a declaratory judgment that the Corps' extension of the permits without first having prepared an environmental impact statement (EIS) constitutes a violation of the NEPA and (2) an injunction requiring the Defendants to rescind the permit extensions and to prohibit any shell dredging in the affected areas until an adequate EIS is prepared.

Presently before the court are the following Motions:

(1) The Motion of Federal Defendants to Limit Review to Evidence Contained within the Administrative Record;

(2) The Motion of Defendants Col. Robert C. Lee, Lt. Gen. Joseph K. Bratton, William R. Gianelli and John O. Marshal, Jr. (collectively referred to as the Federal Defendants) to Dismiss the State of Louisiana as a Plaintiff;

(3) The Motion of Defendants-In-Intervention, Radcliff Materials, Inc., Pontchartrain Materials Corp. and Louisiana Materials Co., Inc. to Dismiss the State of Louisiana as a Plaintiff and to Dismiss the Complaint for Failure to Join an Indispensable Party Under Federal Rule of Civil Procedure 19; and

(4) Cross Motions of all parties for Summary Judgment.

On August 29, 1984, the parties presented oral argument in support of the above Motions and were advised that the matter would be taken under advisement. Having considered the applicable law and arguments of counsel, the court enters its findings below.

**2.** The only documents presented to the court in regard to environmental impact that are not in the administrative record are the affidavits of Stephen Steimle and Maureen Mulino attached

## I. MOTION TO LIMIT REVIEW TO ADMINISTRATIVE RECORD

In this Motion, the Federal Defendants seek to restrict the court's review to the documents that were before the Corps when the decision not to prepare an EIS was made.[2]

■ All parties agree that the administrative record is indeed the "focal point" for determining the reasonableness of the Corps' action. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court will consider evidence beyond the administrative record only when it is alleged that the administrative record is in some manner deficient or inadequate. *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5th Cir.1973).

In oral argument, all parties agreed that the administrative record is in all manners complete and adequate. Although conceding the adequacy of the present administrative record, the Plaintiffs suggest that this case is not procedurally in the posture to dispose of on the summary judgment motion brought by Defendants. According to the Plaintiffs, discovery is necessary to determine the weight given by the Corps to a 1977 report authored by the Gulf South Research Institute at the direction of the shell dredging companies. This report was a condition precedent to a time extension permit in 1974.

■ The court finds that further discovery is unnecessary because the administrative record does not indicate that the Corps merely "rubber-stamped" the GSRI report. *Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 643 (5th Cir.1983); *Cf. Sierra Club v. Sigler,* 695 F.2d 957, 962 n. 3 (5th Cir.1983). To the contrary, the administrative record reflects that the Corps made an objective independent assessment of the studies it accumulated, of which the GSRI report was one of many.[3] Thus,

to the Brief in Support of the Defendants-In-Intervention Motion for Summary Judgment.

**3.** The 1984 GCA EA references 14 independent reports, studies and articles dealing with the

there is no procedural bar to a final adjudication. Accordingly, the Motion to Limit Review to the Administrative Record is GRANTED.

## II. MOTION TO DISMISS THE STATE OF LOUISIANA AS PARTY PLAINTIFF

This Motion, brought by both the Federal Defendants and the Defendants-In-Intervention, is based on several alternative premises. Due to a misconception by the Defendants of the nature of this action, all of the premises lack merit.

### Parens Patriae Standing of Louisiana

■■■ Both the Federal Defendants and the Defendants-In-Intervention assert that the State of Louisiana is without *parens patriae* standing. Generally, it is true that a state cannot sue the Federal Government in a *parens patriae* capacity. *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). The rule of *Mellon* is limited, however, to the factual circumstance of a state challenging the constitutionality of a federal statute. When the state *relies* upon the validity of a federal statute to assert a violation of it by an administrative agency charged with its enforcement, a state has *parens patriae* standing. *State of Alabama v. Tennessee Valley Authority,* 467 F.Supp. 791, 794 (N.D.Ala.1979), *aff'd. in pertinent part,* 636 F.2d 1061 (5th Cir.) *cert. denied* 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1981); *Washington Utilities & Transportation Commission v. F.C.C.,* 513 F.2d 1142, 1153 & n. 16 (9th Cir.1975), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975).

■■ The exception to the rule of *Mellon* applies to this case; the State of Louisiana in fact relies on the NEPA in an effort to avail itself of the NEPA's protection. Furthermore, it is apparent that the requisite quasi-sovereign interests [4] of Louisiana are implicated in this litigation. *Louisiana v. Texas,* 176 U.S. 1, 19, 20 S.Ct. 251, 257, 44 L.Ed. 347 (1900); *State of Alabama,* 467 F.Supp. at 794. Accordingly, the court finds that the State of Louisiana has *parens patriae* standing.

### Equitable Estoppel

In advancing this argument, the Defendants-In-Intervention contend that it is inconsistent for the State of Louisiana to appear as a plaintiff in this litigation when state agencies have already, pursuant to state law, let water-bottoms and issued coastal use permits to the shell dredging companies.[5] The State of Louisiana counters with an argument that the compliance of the shell dredging companies with state law is irrelevant to an alleged violation of the NEPA.

■■ The court finds the rejoinder persuasive. The fact that the dredging companies complied with state law by attaining the approval of various state agencies in acquiring leases and permits, and, assuming that the Attorney General did not comment upon the effects of dredging prior to the issuance of the "state" permits, is of no moment to the alleged violation of the procedural requirements of the NEPA, that is, the failure to file an EIS. The course of conduct presently pursued by the State of Louisiana—requiring the Corps to prepare an EIS—is not necessarily inconsistent with the approval of leases and permits

---

subject matter, 6 reports drafted by the Corps concerning dredging in other tidal bay areas, and a Final Environmental Impact Statement prepared by the Louisiana Department of Natural Resources. The 1984 LA EA references over 70 independent reports and studies. Public hearings were conducted in regard to the continuation of dredging in both areas.

**4.** In this litigation, the State of Louisiana seeks to vindicate the rights of its citizens at large as well as the state's proprietary interests.

**5.** The Wildlife and Fisheries Commission is authorized to let state water-bottoms for the purpose of dredging shell deposits. La.R.S. 56:441(A). The Louisiana Coastal Commission, a branch of the Department of Natural Resources, has authority over the extension of coastal use permits. La.R.S. 49:213.11. It is undisputed that the dredging companies attained the leases and permits required by state law.

pursuant to state law. Therefore the actions of the Department of Natural Resources (DNR) and the Wildlife and Fisheries Commission (WFC) cannot be construed to be an implied waiver by the State of Louisiana of any benefits it may have under the NEPA. As such, the initial element of equitable estoppel—a representation by the plaintiff—is lacking. *See Zimeri v. Citizens & Southern International Bank of New Orleans,* 664 F.2d 952, 955 (5th Cir.1981). Nor can it be said that the State of Louisiana has engaged in a prolonged course of conduct that would induce a "justifiable reliance" by the dredging companies that the State of Louisiana would not oppose the Corps' actions in this case. *Cf. Michigan Wisconsin Pipeline Co. v. Williams-McWilliams Co.,* 551 F.2d 945, 951 (5th Cir.1977).

*Authority of State of Louisiana and Attorney General to Bring Action*

■ The Defendants-In-Intervention also contend that the State of Louisiana and its Attorney General lack the authority to bring this action because it conflicts with the true public policy of Louisiana.

The Attorney General of Louisiana is empowered with broad authority to prosecute actions in the interest of the state. La. Const. Art. 4, § 8 (1974); *State v. Texas Co.,* 199 La. 846, 7 So.2d 161, 162 (1942); *Moity v. Louisiana State Bar Association,* 414 F.Supp. 180, 181 n. 3 (E.D.La.), *aff'd.,* 537 F.2d 1141 (1976).

The shell dredging companies contend that the public policy of Louisiana is expressed in La.R.S. 56:441. This statute merely provides that the Wildlife and Fisheries Commission "may sell and grant to any person the right and privilege of taking shell deposits from any of the shell reefs" located in Louisiana and delineates the prerequisites to attaining such a right. *Id.*

On the other hand, Louisiana made positive expressions in regard to protecting the state's natural resources and environment. In particular, Article 9, § 1 of Louisiana's Constitution (1974) provides:

"The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.

In any event, the policy of permitting the shell dredging of state owned water-bottoms, whether or not it is in the public interest, *is not being* challenged. Again, it is the failure of the Corps to file an EIS to which the State of Louisiana objects. Thus, the court finds that neither the State of Louisiana, nor its Attorney General, are prohibited from bringing this action for want of authority.

## III. MOTION TO DISMISS FOR FAILURE TO JOIN UNDER RULE 19

The argument made herein is closely related to one addressed immediately above. In this Motion, which is urged by the Defendants-In-Intervention, it is contended that the WFC and DNR must be joined as defendants because these agencies have an interest in the ability of the dredging companies to operate under the leases and coastal use permits issued by these agencies and a judgment adverse to the Defendants would prejudice this interest. The movers further contend that since the joinder of the WFC and DNR would result in the anomalous situation of the State of Louisiana, through the Attorney General, appearing as plaintiffs and the state agencies appearing as defendants, the appropriate action would be to dismiss the State of Louisiana as a party plaintiff. The court declines to do so.[6]

---

**6.** Central to the mover's argument is the question of where exactly the interests of Louisiana lie. Although, as movers emphasize, the WFC derives revenues from the issuance of leases, the enabling legislation of both DNR and WFC proclaims, as a matter of public policy, that the natural resources and environment are primary considerations. *See* La.R.S. 49:213.2(5); La.R.S.

■ Due to the nature of this action, the effect that a judgment may have on third parties is irrelevant. The rights embodied in the NEPA are "public", rather than "private". *Natural Resources Defense Council v. Berklund,* 458 F.Supp. 925, 933 (D.D.C.1978), *aff'd.* 609 F.2d 553 (D.C.Cir.1979). The constraints of Rule 19 apply only to adjudications of "private rights". *Id., citing National Licorice Co. v. NLRB,* 309 U.S. 350, 366–67, 60 S.Ct. 569, 578, 84 L.Ed. 799 (1940); *Kirkland v. New York State Dept. of Correctional Services,* 520 F.2d 420, 424 (2d Cir.1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). Thus, under the rule of *National Licorice,* the DWF and DNR are not considered necessary parties. *See also State of Delaware v. Bender,* 370 F.Supp. 1193, 1197 (D.Del.1974).

## IV. MOTION FOR SUMMARY JUDGMENT

■ The procedural scheme contemplated by the NEPA and the Council on Environmental Quality NEPA Regulations (CEQ NEPA) is a relatively simple one. Paraphrasing § 4332(2)(C) of the NEPA, all agencies of the Federal Government are required to include in every recommendation or report on proposals for major Federal actions significantly affecting the quality of the human environment, a detailed statement on the environmental impact, or EIS, of the proposed action. Stated another way, an EIS is mandated only if the major Federal action [7] significantly affects the quality of human environment. *Save Our Ten Acres,* 472 F.2d at 465.

■ The threshold determination of whether the effect of the proposed action is sufficiently "significant" is made by the preparation of an Environmental Assessment (EA). 40 CFR § 1508.9. If the agency determines upon examination of the EA that the proposed action would not have a significant effect on the human environment, a "finding of no significant impact" or FNSI, must be prepared. 40 CFR § 1508.13. Conversely, if the EA reveals that the quality of human environment would be significantly degraded by the proposed action, an EIS is required. *Save Our Wetlands,* 711 F.2d at 644. Factors to be considered in making the "significance" determination include both the context and the intensity of the proposed action. 40 CFR § 1508.27.[8] *See also Hanly v. Klein-*

---

56:1. The court need not resolve whether the State of Louisiana's posture in this litigation is aligned with that of the true public interest, and indeed should refrain from doing so. That decision is primarily a political one and is within the discretion of the Attorney General.

7. The CEQ NEPA regulations indicate that the Corps' action qualifies as "major". 40 CFR § 1508.18(4). The parties do not contend otherwise.

8. That regulation provides:
"Significantly" as used in NEPA requires considerations of both context and intensity:
(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.
(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:
(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if

*dienst,* 471 F.2d 823, 830–31 (2nd Cir.1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

The Plaintiff's Motion for Summary Judgment is premised on a contention that the undisputed facts—the EA(s)—do not support the FNSI, or the decision not to prepare an EIS. Stated simply, the Plaintiffs assert that each EA does in fact reveal significant environmental impact and, as a matter of law, the relief sought is proper. Conversely, the Defendants assert that given the undisputed facts, the Corps' decision is a reasonable one.

 The burden is upon the Plaintiffs to demonstrate the necessity for an EIS. *Save Our Wetlands,* 711 F.2d at 644. "The standard of judicial review is whether the agency decision not to develop an impact statement is reasonable and made objectively and made in good faith on a reviewable environmental record. If the decision is reasonable, the determinations must be upheld." *Id.; Vieux Carre Property Owners, Residents & Associates v. Pierce,* 719 F.2d 1272, 1279 (5th Cir.1983).

EFFECTS OF DREDGING AS REFLECTED IN ENVIRONMENTAL ASSESSMENTS [9]

*Gulf Coast Area*

The shells dredged in the Gulf Coast Area (GCA) are primarily oyster shells. Oyster shell deposits are found in reefs formed of millions of cubic yards of shell more or less cemented together. The shells are dredged by means of a barge with an excavating cutter-head that digs through the shell deposits. The shells are recovered by hydraulic suction. Reefs are typically buried under four to eight feet of sediment, and vary in thickness from one to eight feet. In a twenty-four hour period, the dredge barge covers about one hundred and forty linear feet. The physical result of the dredging on the sea bed is a series of shallow troughs and mounds.

The geography of the GCA includes open bays, marshes ranging from fresh water to brackish to saline and cypress-tupelogum swamps. Most notably, the GCA encompasses the Lower Atchafalaya Basin Floodway, described as a "regionally unique faunal habitat". Twenty-two different types of vegetation and marsh grasses are indigenous to the coastal area. Cypress-tupelogum swamps comprise large areas in the southeastern part of the Lower Atchafalaya Basin Floodway. Due to periodic flooding, these swamps are also an important part of the aquatic ecosystem, serving as a nursery area for sport and commercial fish. The swamps are home to nutria, mink, raccoon and are a breeding ground for wood ducks, heron and egrets.

Six different "impacts" associated with dredging are addressed in the GCA EAs: water quality (turbidity, contaminants, etc.), benthic organisms (oysters), nektonic organisms (fish, crabs and shrimp), the

it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.

9. After a May 23, 1984 Status Conference, the court granted the Corps additional time within which to reconsider its decision not to prepare an EIS. The Corps' decision was originally based on EAs prepared in 1982. As a result of the reconsideration, a revised 1984 EA and Findings of Fact were generated for both areas. The court has previously denied a Motion brought by the Federal Defendants "To Remove the 1982 Environmental Documents from the Record and to Require Plaintiff to File an Amended Complaint." Thus, both the 1982 and 1984 EAs are relevant to the court's inquiry, particularly in light of the Corps' continued adherence to its original decision.

formation of the Atchafalaya Delta, the relationship between the trenches left by dredging and storm waters, and the impact caused by the dredging of exposed reefs.

Undoubtably, the most adverse impact attributable to dredging on the environment in the GCA would be the interruption of the delta-building process where the Atchafalaya River empties in the Gulf of Mexico:

> Dredging in the developing Atchafalaya Bay Delta may seriously impact the formation of the delta mainly through loss of shallow water bottom and accelerated erosion. the Atchafalaya Bay Delta is projected to develop into more than 80 square miles of tidal wetlands. This new land development is a rare occurrence in coastal Louisiana, where marshes have been deteriorating at an average rate of 39 square miles a year. The delta is composed of approximately 16 square miles of vegetated islands, extensive shallow flats, and numerous interconnecting natural channels. Preliminary assessments from studies on Atchafalaya delta building indicate that dredging, and in particular shell dredging, apparently interferes with processes associated with the distribution of sediment within the delta complex.

1984 GCA EA at 11.

In light of the definite adverse impact on the Atchafalaya Delta, the 1984 GCA EA recommends that all shell dredging activities should be kept outside of the delta building area.

The Corps also found that dredging of exposed reefs affects the ecosystem of the tidal bays. Dredging these exposed reefs alters the natural water circulation patterns of the estuaries that are a nursery ground for "almost all of the economically important fish and shell fish." Besides providing an important habitat for both marine life and birds such as gulls and terns, the reefs act as barriers which protect adjacent shorelines and marshes from wave erosion. Furthermore, sports fishing would be significantly impacted if dredging were allowed in areas near exposed reefs

and other areas heavily fished, namely in certain parts of Vermilion and Weeks Bay. As with the Atchafalaya Delta, it is concluded that restricting dredging from the areas surrounding the exposed reefs and areas heavily utilized for sports fishing will greatly reduce the degree of impact.

The impact on water quality is generally considered minimal and of a temporary and short-lived nature. This same assessment holds true for nektonic organisms which, due to their mobility, can easily avoid dredging activities and feed elsewhere.

The Corps deemed the physical removal and/or burial of benthic organisms by dredging a significant impact on these organisms but that such impact would be limited to a small area in comparison to the vastness of the water bottoms involved. Any possibility of harm to live oyster beds can be alleviated by use of proper dredging techniques to assure that the turbidity plumes are carried away from the beds by currents, wind and gravity.

The Corps determined that the trenches left by dredging have no effect on directing storm surges toward the mainland.

*Lakes Area*

The shells dredged in the Lakes Area (LA) are primarily clam, or *rangia cuneata*. These fossil clam shells, unlike oyster shells, are not attached to one another in reef formations. The nature of the operation and equipment used in dredging this area is somewhat different than that used in the GCA, but the effect on the water-bottom is similar: a shallow trench about two feet deep and four to five feet wide. Lakes Pontchartrain and Maurepas are low salinity estuaries which together cover an area of approximately 723 square miles. The lakes are connected to one another through Pass Manchac and North Pass; Lake Pontchartrain connects with the Gulf of Mexico through the Rigolets, Chef Menteur Pass, Lake Borgne, the Mississippi Sound and several manmade waterways.

The lakes are highly turbid and the beds are predominantly silty clay. Marsh ranging from freshwater to brackish, with cy-

press-tupelogum swamp and urban areas surround Lake Pontchartrain; freshwater marsh and cypress-tupelogum swamp surround Lake Maurepas.

Thirty-six types of vegetation, including various marsh grasses, bald cypress and drummond red maple are indigenous to the area. A 1976 study relied on by the Corps lists 82 types of vertebrae and invertebrate collected in the LA. Among these are various types of mussels, clams and oysters, five types of shrimp, and numerous types of both saltwater and freshwater fish. A 1962 study noted by the Corps states that only four organisms maintain large resident populations in the Lake Area: anchovy, brackish water clams, mud crab and calanoid copepod. Of the claims, *rangia cuneata* is the most abundant.

Migratory waterfowl, such as scaup, mallards and coots as well as other birds reside in the LA. The marsh and swamp areas are inhabited by raccoon, oppossums, rabbit, nutria, muskrat, mink, white-tailed deer and squirrels.

The 1984 LA EA specifically addresses the impacts of shell dredging on benthic and nektonic organisms, vegetation, and water quality.

As in the coastal waters, the Corps found that the impact on nektonic organism in the LA is not significant due to the ability of these organisms to avoid dredging activity. Since dredging is prohibited in Lake Pontchartrain in areas shallow enough to support growth and Lake Maurepas is devoid of rooted submerged vegetation, the Corps found no impact on vegetation.

However, as in the GCA, the Corps discerned an adverse impact on the benthos of the LA attributable to dredging. The benthic organisms which are in the direct path of the dredge will be smothered by the discharge. In some instances, mud also flows outside the dredged cut. Never-

theless, the impact on the benthic community is not considered to be significant because the effects are temporary and short term. To a great extent, the finding of a less than significant effect on the benthos of the LA is grounded on the premise that the major adverse impact occurred 25–30 years ago.[10]

The impacts to the water quality of Lake Pontchartrain associated with turbidity created by dredging is also considered minimal. This conclusion is based on the size, depth, volume and tidal action of the water body. Due to the smaller dimensions, a naturally occurring imbalance of the carbon-nitrogen-phosphorous ratio, seasonally high temperatures, low flushing rate and fresher water, that above proposition does not hold true for Lake Maurepas. Due to a combination of these factors, there is a "potential for the occurrence of a stressful system-wide event" in Lake Maurepas.

For this reason, it is recommended in the LA EA that dredging in Lake Maurepas be discontinued until a monitoring program designed to detect the onset of potentially unacceptable situations and a method of greatly minimizing the turbidity plumes can be implemented.

The Corps concluded that the so-called "dead zones" discovered in Lake Pontchartrain and the contaminants found in them are unrelated to shell dredging.

The 1984 LA EA poses the question: "What would happen if shell dredging were discontinued"? It is deduced that "considering the influences attributed to shell dredging over the last 50 years, the discontinuation of shell dredging would surely lead to the establishment of some other benthic community." *Id.* at 20. The long-term impacts are summarized in this fashion:

Due to modifications of sediments caused by the direct-ever passage of a shell dredge, it is unlikely that a total recovery

---

10. It is appropriate to consider the *status quo* of the environment in the area affected. *Sierra Club v. Hassell,* 636 F.2d 1095, 1099 (5th Cir. 1981). The 1984 LA EA in the instant case summarizes various reports as concluding that the diversity of the benthic community that ex-

isted in Lake Pontchartrain in 1930's (when dredging initially started) was lowered decades ago. A study noted by the Corps hypothesizes that the remaining benthos of Lake Pontchartrain is composed of only the "hardiest organisms of the original community."

was ever possible. Nonetheless, if shell dredging were discontinued altogether and enough time were allowed to elapse, a self-sustaining benthic community would arise and stable sediment profile could become established. Persuasive evidence exists to show that recurrent shell dredging in Lake Pontchartrain precludes that possibility. Instead, recurrent shell dredging has induced the establishment of and does perpetuate the existence of a benthic community that exhibits attributes that are in synchrony with shell dredging. The induced community (that exists today) evidences many of the attributes ascribed to communities that: 1) have been subjected to prolonged periods of stress; and 2) arise during early stages of succession.

*Id.* at 20–21.

SIGNIFICANCE OF THE EFFECTS

Col. Lee, the District Engineer and ranking officer for the New Orleans District of the Corps, concludes that for both areas, the effects of dredging are not significant, *given the conditions which are imposed on the dredging permits.* For instance, he finds in regard to the GCA:

Although there are adverse impacts associated with shell dredging, the special conditions and other restrictions placed on the operations have reduced them to such extent that an environment impact statement is not required. No Federal resource agency indicated that the expected impacts are of enough significance to require preparation of an environmental impact statement.

GCA Revised Findings of Fact, p. 7

Similarly, in regard to the LA, Col. Lee concludes:

While it is recognized that shell dredging does cause impacts, my finding, based in part on my staff's review of all available studies and literature, does not indicate the impacts are of enough significance to require preparation of an environmental impact statement. I find the impacts of the shell dredging operations under the conditions of the permits to be not significant.

LA Revised findings of Fact, pp. 7–8.

Both the Federal Defendants and the Defendants-In-Intervention reiterated in argument to the court that the effects of dredging, *sans* the conditions imposed in the permits, are significant. Nevertheless, the Defendants contend that the conditions are such that the need for an EIS is obviated.

■ The nature of judicial review is a limited one; the court cannot interject its opinion for that of the agency's. *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980). It is undisputed that the effects of dredging are environmentally significant, when *not* tempered by the restrictions set out in the permits. As such, the legal issue presented by the determinations made by the Corps in the case at bar is whether the Corps can consider the conditions in making a "significance" determination.

The majority of courts facing the issue have allowed agencies to avoid the EIS requirement by modifying projects to bring them below the significance threshold. Glitzenstein, *Project Modification: Illegitimate Circumvention of the EIS Requirement or Desirable Means to Reduce Adverse Environmental Impacts?* 10 Ecology Law Quarterly 253, 256 (1982). *See also Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 682 (D.C.Cir.1982); *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 860 (9th Cir.1982); *Simmans v. Grant,* 370 F.Supp. 5, 21 (S.D.Tex.1974). *Contra: Citizens for Responsible Area Growth v. Adams,* 477 F.Supp. 994 (D.N.H. 1979).[11] To date, the Fifth Circuit has yet to address the issue.

In disregarding the conditions imposed on the permits, the Plaintiffs rely on a statement published by the CEQ at 46 Fed. Reg. 18026 (1981) entitled "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regula-

---

**11.** In *Preservation Coalition,* the court held that "when [the mitigating modifications are] to be undertaken by third parties, their commitments, while they need not be contractual, must be more than mere vague statements of good intentions." 667 F.2d at 860 (citations omitted).

**656**

tions." The response to Question 40 suggests that "[m]itigation measures may be relied upon to make a finding of no significant impact only if they are imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal." *Id.* at 18038.

In *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678 (D.C.Cir.1982), the appellants also relied on the above cited publication. The court deemed such reliance misplaced for several reasons. Firstly, the publication is not a regulation but is merely an informal statement, and thus is not entitled to the deference usually afforded administrative regulations. *Id.* at 682. Secondly, the underlying regulations do not reflect that consideration of mitigation measures is inappropriate, although the publication states that it imposes no additional requirements beyond those in the NEPA regulations. Id. at 683.[12]

■■■ Regardless of the weight to which the aforementioned publication is entitled to, this court is convinced that consideration of mitigating conditions is not inconsistent with the policies of the NEPA. "The policies of the NEPA partly rest on informing Congress and the public about potential environmental effects, as well as exploring alternatives to the action which might lead to less environmental impact." *Maryland-National Capital Park and Planning Commission v. U.S. Postal Service,* 487 F.2d 1029, 1041 (D.C.Cir.1973). The requirement of an EIS is designed to implement this policy by acting as a full disclosure of the environmental consequences of a proposed action, and by ensuring that an agency will integrate environmental concerns into its decision-making process at the earliest possible stages. Glitzenstein, *supra* at 264 (citations omitted).

The policy of disclosure and responsible environmental decision-making were given

proper deference by the Corps in the case *sub judice.* The EAs reflect an objective and independent assessment of a comprehensive compilation of studies and articles dealing with the overall short-term and long-term environmental impacts of shell dredging.[13] There exists no valid reason to disregard the conditions imposed by the Corps, as well as those imposed by various state agencies.[14] To do so is to ignore the realities of the proposed action and require an EIS because of the effects posed by a "hypothetical" project, rather than the effects of the actual proposal. *See also Simmans,* 370 F.Supp. at 18 (just as mitigation measures are required in an EIS, such measures should likewise be identified in an environmental impact appraisal). The procedural scheme of NEPA is not so inflexible that the actual effect of the proposal must take a back seat to the effects of an action to which in fact, the environment will not be subjected. *Cf. Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1003 (D.C.Cir.1979).

Having decided that the Corps can properly consider the conditions imposed on the permits, the question of the reasonableness *vel non* of the "no significant effect" decision remains.

As for the GCA, the conditions address, *inter alia,* the primary concern of the effect on the emerging Atchafalaya Delta. Dredging is prohibited in a well-defined area near the Atchafalaya River Delta and the Wax Lake Outlet Delta. Likewise, dredging is prohibited within 1,000 feet of exposed oyster reefs and within 1,500 feet of any shoreline, and in specific areas heavily fished by sportsmen.

The Corps found that benthic organisms near or in the path of the dredge will be adversely impacted. But considering, as the Corps did, the limited number of benthic organisms so affected in comparison to the vastness of the area involved, the court

---

**12.** The court in *Cabinet Mountains Wilderness* also noted that the publication could not be afforded retroactive effect to the facts of that case. 685 F.2d at 683. The instant case presents no retroactivity bar to consideration of the publication.

**13.** *See* note 3, *supra.*

**14.** The Louisiana Department of Natural Resources and Wildlife and Fisheries Commission have imposed conditions on the permits and leases required by state law.

finds the Corps' ultimate conclusion a reasonable one. The CEQ NEPA guidelines indicate that in making the significance determination, it is proper, under certain circumstances, to consider a broad context in which the effect takes place. 40 C.F.R. § 1508.27(a). Many areas inhabited by benthos will be untouched by dredging. Moreover, there are no threatened or endangered species impacted by dredging activity.

The conditions imposed in the LA permits include, as mentioned *infra*, a complete prohibition of dredging in Lake Maurepas until a monitoring system program approved by the New Orleans District of the Corps is implemented to detect the onset of potentially unacceptable situations relative to turbidity. Dredging is also prohibited in certain areas of Lake Pontchartrain, including the eastern part which contains live oysters.

In regard to the impacts associated with turbidity on the benthos of Lake Pontchartrain, it is noted that the Corps' conclusion that the effects are short-term and of a temporary nature, standing alone, are not enough to reduce the effects below the significance threshold. *See* 40 C.F.R. § 1508.27(b)(7). However, the court nevertheless finds reasonable the Corps' conclusion that given the environmental status of Lake Pontchartrain, the effect on the present benthic community is insignificant. *Sierra Club v. Hassell,* 636 F.2d at 1099.

Furthermore, the state agencies have placed onerous conditions on the dredging activities for both areas as well. The manner of dredging and the number of shell dredging barges are restricted, not to mention specific areas which are off-limits. The requirement of the installation of a tamper-proof Loran C continuous location recording system on the dredge barges also assures that dredging is only done in those areas not restricted in the permits. Since the possible significant effects of dredging are mitigated by the conditions imposed by Corps and state agencies, the court finds that the Corps was not unreasonable in determining that preparation of an EIS is unnecessary.

CONCLUSION

IT IS ORDERED that:

(1) The Motion of Federal Defendants to Limit Review to Evidence Contained within the Administrative Record be and it is hereby GRANTED;

(2) The Motion of Federal Defendants and Defendants-In-Intervention to Dismiss the State of Louisiana and the Complaint (on all grounds) be and it is hereby DENIED;

(3) The Motion of Plaintiffs for Summary Judgment be and it is hereby DENIED; and

(4) The Motion of Federal Defendants and Defendants-In-Intervention for Summary Judgment be and it is hereby GRANTED.