STATE of Louisiana ex rel. William J. GUSTE, Jr., Attorney General; Save Our Coast, Inc.; The Orleans Audubon Society; Sierra Club; Manchac Fisherman's Association; Environmental Defense Fund

v.

Colonel Robert C. LEE, District Engineer, New Orleans, District, U.S. Army Corps of Engineers, Lieutenant General Joseph K. Bratton, Chief of Engineers, Department of the Army, William R. Gianelli, Assistant Secretary (Civil Works), Department of the Army, and John O. Marsh, Jr., Secretary, Department of the Army.

Civ. A. No. 83–6126.

United States District Court,
E.D. Louisiana.

April 23, 1986.

As Amended June 3, 1986.

Michael Osborne, New Orleans, La., Katherine P. Ransel, Nicholas C. Yost, Washington, D.C., William J. Guste, Jr., Atty. Gen., State of La., Peter M. Arnow, Louisiana Dept. of Justice, Baton Rouge, La., James T.B. Tripp, New York City, for plaintiffs.

John R. Peters, Jr., John Volz, U.S. Atty., New Orleans, La., F. Henry Habicht, II, Land & Natural Resources Div., Washington, D.C., Joe Leblanc, Frank J. Peragine, Elizabeth Griffin, U.S. Army Corps of Engineers, New Orleans, La., for defendants.

## OPINION, ORDER AND JUDGMENT

McNAMARA, District Judge.

### I. STATEMENT OF THE CASE

This matter comes before the court a second time, on remand for reconsideration from the United States Fifth Circuit Court of Appeals.[1] As stated in our earlier opinion,[2] this litigation arises out of the five-year extension of six shell dredging permits issued by the United States Army Corps of Engineers [hereinafter the "Corps"] pursuant to the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and the Clean Water Act, 33 U.S.C. § 1344. The permits allow four shell dredging companies to dredge in two areas of southern Louisiana. The "Gulf Coast Area" [hereinafter "GCA"] consists of the Gulf of Mexico, East and West Cote Blanche, Four League Bay and Vermillion Bay. The "Lakes Area" [hereinafter "LA"] consists of Lake Pontchartrain and Lake Maurepas.

Plaintiffs, the State of Louisiana and several private environmentalist groups,[3] allege that the Corps violated the National Environmental Policy Act [hereinafter "NEPA"], 42 U.S.C. § 4321 et seq., and the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Three of the shell dredging companies subject to the permits, Louisiana Materials Company, Inc., Dravo Basic Materials Co., Inc. [formerly Radcliff Materials, Inc.], and Pontchartrain Materials

---

1. *State of Louisiana v. Lee,* 758 F.2d 1081 (5th Cir.1985).

2. *State of Louisiana v. Lee,* 596 F.Supp. 645 (E.D.La.1984). The following recitation of facts is gleaned from this court's earlier opinion.

3. The private environmentalist groups involved as "private" plaintiffs are Save Our Coast, Inc., The New Orleans Audubon Society, Sierra Club, Manchac Fisherman's Association, and the Environmental Defense Fund.

Corp., have intervened in this proceeding as Defendants, pursuant to Fed.R.Civ.P. 24.

In their complaint, Plaintiffs seek:

(1) A declaratory judgment that the Corps' extension of the shell dredging permits without having first prepared an environmental impact statement [hereinafter "EIS" ] constitutes a violation of the NEPA;[4] and

(2) An injunction requiring the Corps to rescind the shell dredging permits and to prohibit any shell dredging in the affected areas until an adequate EIS is prepared.

■■■ As noted in our earlier opinion, the procedural scheme contemplated by the NEPA and the CEQ NEPA Regulations is a relatively simple one. Paraphrasing § 4332(2)(C) of the NEPA, all agencies of the federal government are required to include in every recommendation or report on proposals for all major federal actions[5] significantly affecting the quality of the human environment, a detailed statement on the environmental impact (EIS) of the proposed action. Stated another way, an EIS is mandated if a major federal action significantly affects the quality of human environment. *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 465 (5th Cir.1973).

(a) *Procedural History* —Prior to the remand of this matter, Plaintiffs had moved for summary judgment. The Corps responded with a motion to suspend judicial proceedings so that the matter could be remanded to the Corps for further consideration. The court granted the Corps' motion, allowing approximately nine weeks for the reconsideration. After reconsidering the matter, the Corps filed a revised environmental assessment [hereinafter 1984 EA] and findings of fact. Once again,

the Corps issued a finding of no significant impact and thus again concluded no EIS was required. The Corps then filed a motion to remove the 1982 EA documents from the record, but the court denied the motion. This court then entertained cross-motions of all parties for summary judgment, ultimately granting Defendants' motion for summary judgment and dismissing Plaintiffs' claim that the Corps violated the NEPA in failing to prepare an EIS prior to renewal of the shell dredging permits in issue. Plaintiffs then appealed this court's order, asserting that Defendants did not "establish that there was no material dispute as to whether the Corps was reasonable in concluding that no significant environmental impact would result from continuing the dredging." *State of Louisiana v. Lee,* 758 F.2d at 1082. The Court of Appeals vacated and remanded finding this court applied an improper standard of judicial review.

## II. THE APPROPRIATE STANDARD OF JUDICIAL REVIEW

As pointed out in our earlier opinion, "[t]he threshold determination of whether the effect of the proposed action is sufficiently 'significant' is made by the preparation of an Environmental Assessment (EA)." *State of Louisiana v. Lee,* 596 F.Supp. at 651 (citing 40 C.F.R. § 1598.9). We further noted that if, upon examination of the EA, the agency concludes that the proposed action *would* not have a significant effect on the human environment, a "finding of no significant impact" [hereinafter FONSI] must be prepared. *See,* 40 C.F.R. § 1508.13. Conversely, "if the EA reveals that the quality of human environment *would* be significantly degraded by

---

**4.** Prior to the issuance of the permit renewals, the Corps undertook an environmental assessment [hereinafter 1982 EA] of the affected areas as mandated by the Council on Environmental Quality [hereinafter CEQ] NEPA Regulations, 40 C.F.R. § 1508.9. After reviewing the 1982 EA, the Corps issued a finding of no significant impact under 40 C.F.R. § 1508.13, thus concluding that the NEPA did not require preparation of an EIS.

**5.** The Corps does not contend that their decision to renew the shell dredging permits did not amount to major federal action. In fact, a review of the CEQ NEPA regulations confirms that the Corps' action in the case at bar qualifies as "major." Therefore, the crux of the present controversy centers on the potential significant impact of shell dredging on the human environment. *See, State of Louisiana v. Lee,* 758 F.2d at 1083.

the proposed action, an EIS is required." 596 F.Supp. at 651 (citing *Save Our Wetlands v. Sands,* 711 F.2d 634, 644 (5th Cir.1983)).

In reviewing this court's granting of Defendants' motion for summary judgment, the Fifth Circuit noted the above language and concluded that the court had subjected Plaintiffs to an improper evidentiary burden, requiring Plaintiffs "to prove a significant degradation of the environment actually *would* result before the Corps' conclusion could be deemed unreasonable." 758 F.2d at 1084 (emphasis added). The circuit court pointed out that the standard utilized [6] would have been accurate if it had read "the quality of the human environment *may* be significantly degraded." *Id.* (emphasis in original).

A recent recapitulation of the proper standard of review as well as the plaintiff's burden of proof in environmental litigation was set forth in *Louisiana Wildlife Federation v. York,* 761 F.2d 1044 (5th Cir.1985). The circuit court succinctly stated that " '[t]he standard of judicial review is whether the agency decision not to develop an impact statement is reasonable and made objectively and in good faith on a reviewable environmental record. If the decision is reasonable, "the determination must be upheld".' " 761 F.2d at 1052 (citations omitted). In regards to Plaintiffs' burden of proof in environmental litigation, Judge Rubin stated that "[n]ow ... it is clear that the plaintiffs must prove 'that the Corps was unreasonable in concluding there was no reasonable possibility that the proposed action would significantly degrade any environmental factor.' " *Id.* at 1054 (Rubin, J., dissenting). (citing *State of Louisiana v. Lee,* 758 F.2d at 1085).[7] Simply stated, "the test is whether there is a possibility, not a certainty, of significant

impacts." *Fritiofson v. Alexander,* 772 F.2d 1225, 1238 n. 7 (5th Cir.1985).

In ascertaining the reasonableness *vel non,* the Fifth Circuit has pointed out that a decision not to prepare an EIS may be deemed unreasonable for two distinct reasons:

(1) The evidence before the court indicates that the proposed project *may* have a significant impact on the human environment, contrary to the FONSI, or

(2) "The agency's review was flawed in such a manner that it cannot yet be said whether the project may have a significant impact." *Fritiofson v. Alexander,* 772 F.2d at 1238.

The circuit court has emphasized that the appropriate relief is often contingent upon which of these findings the district court makes. "If the court finds the proposed project may have a significant impact, the court should order an EIS." *Fritiofson,* 772 F.2d at 1238 (citations omitted). However, if the court concludes that the EA is inadequate and deficient such that it cannot yet be said whether the proposed project may have a significant impact, the court should remand the case to the agency to correct the deficiencies. *Id.*

As noted, this court remanded this matter to the Corps, allowing the agency additional time to re-evaluate and reconsider its initial decision to forego preparation of an EIS. The 1984 EA was an outgrowth of that re-evaluation.

■ Accordingly the reasonableness *vel non* of the Corps' decision to forego preparation of an EIS is contingent upon Plaintiffs showing that the proposed project *may* have *significant* adverse impacts on, or either *may* cause a *significant* degradation of, some human environmental factor.

---

**6.** The Fifth Circuit noted that this court had relied upon explicit language from *Save Our Wetlands, supra,* in articulating the proper standard of review. The circuit court pointed out, however, that the language employed in *Save Our Wetlands* was not intended to alter the standard of review as set forth in *Save Our Ten Acres,* "which remains the controlling precedent

on this question in our circuit." *Id.* at 1084–85.

**7.** Judge Rubin pointed out that "[p]rior to [the Fifth Circuit's] decision in *Lee,* the language of [Fifth Circuit] decisions was neither consistent nor pellucid." *Id.*

In construing the term "significant," the Fifth Circuit has stated that " 'significant' is 'a chameleon-like word that takes its functional meaning from the context.' " *Louisiana Wildlife Federation v. York, supra,* 761 F.2d at 1052–53. (citation omitted). Some of the factors to be considered in making the determination of "significance" include not only the context, but also the intensity of the proposed action. 40 C.F.R. § 1508.27.[8]

## III. EFFECTS OF DREDGING[9] AS REFLECTED IN ENVIRONMENTAL ASSESSMENTS[10]

### Gulf Coast Area

The shells dredged in the Gulf Coast Area (GCA) are primarily oyster shells. Oyster shell deposits are found in reefs formed of millions of cubic yards of shell more or less cemented together. The shells are dredged by means of a barge with an excavating cutter-head that digs through the shell deposits. The shells are recovered by hydraulic suction. Reefs are typically buried under four to eight feet of sediment, and vary in thickness from one to eight feet. In a twenty-four hour period, the dredge barge covers about one hundred and forty linear feet. The physical result of the dredging on the sea bed is a series of shallow troughs and mounds.

The geography of the GCA includes open bays, marshes ranging from fresh water to brackish to saline and cypress-tupelogum swamps. Most notably, the GCA encom-

---

**8.** 40 C.F.R. § 1508.27 provides:

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. *A significant effect may exist even if* the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.

**9.** The following summation of effects is extracted from this court's findings as set forth in our earlier opinion at 596 F.Supp. at 652–54. It is important to note that on appeal, the Fifth Circuit did not question nor disturb the findings of this court, but rather ordered this court to apply a different legal standard to our findings in determining the reasonableness *vel non* of the Corps' decision to forego preparation of an EIS.

**10.** As noted earlier, the court denied the Corps' motion to remove the 1982 EA documents from the record. This court found [and still finds] that *both* the 1982 and 1984 EAs are relevant to the present inquiry, particularly in view of the Corps' continued adherence to its original decision. 596 F.Supp. at 652 n. 9. See discussion, *infra,* of the Fifth Circuit's view of the disparity between the 1982 and 1984 EAs.

passes the Lower Atchafalaya Basin Flood-way, described as a "regionally unique faunal habitat". Twenty-two different types of vegetation and marsh grasses are indigenous to the coastal area. Cypress-tupelo-gum swamps comprise large areas in the southeastern part of the Lower Atchafalaya Basin Floodway. Due to periodic flooding, these swamps are also an important part of the aquatic ecosystem, serving as a nursery area for sport and commercial fish. The swamps are home to nutria, mink, and raccoon and are a breeding ground for wood ducks, heron and egrets.

Six different "impacts" associated with dredging are addressed in the GCA EAs: the formation of the Atchafalaya Delta, the impact caused by the dredging of exposed reefs, water quality (turbidity, contaminants, etc.), benthic organisms (fauna or animal life which lives on or within the bottom of the lake including small crustaceans, small snails, clams, oysters, etc.), nektonic organisms (complex organisms such as fish, crabs and shrimp), and the relationship between the trenches left by dredging and storm waters.

Undoubtably, the most adverse impact attributable to dredging on the environment in the GCA would be the interruption of the delta-building process where the Atchafalaya River empties in the Gulf of Mexico:

> Dredging in the developing Atchafalaya Bay Delta *may* seriously impact the formation of the delta mainly through loss of shallow water bottom and accelerated erosion. The Atchafalaya Bay Delta is projected to develop into more than 80 square miles of tidal wetlands. This new land development is a rare occurrence in coastal Louisiana, where marshes have been deteriorating at an average rate of 39 square miles a year. The delta is composed of approximately 16 square miles of vegetated islands, extensive shallow flats, and numerous interconnecting natural channels. Preliminary assessments from studies on Atchafalaya delta building indicate that dredging, and in particular shell dredging, *apparently* interferes with processes associated with the distribution of sediment within the delta complex.

1984 GCA EA at 11. (emphasis added).

In light of the definite adverse impact on the Atchafalaya Delta, the 1984 GCA EA recommends that all shell dredging activities be kept outside of the delta building area.

The Corps also found that dredging of exposed reefs effects the ecosystem of the tidal bays. Dredging these exposed reefs alters the natural water circulation patterns of the estuaries that are a nursery ground for almost all of the economically important fish and shell fish. Besides providing an important habitat for both marine life and birds such as gulls and terns, the reefs act as barriers which protect adjacent shorelines and marshes from wave erosion. Furthermore, sports fishing would be significantly impacted if dredging were allowed in areas near exposed reefs and other areas heavily fished, namely in certain parts of Vermillion and Weeks Bays. As with the Atchafalaya Delta, it is concluded that restricting dredging from the areas surrounding the exposed reefs and areas heavily utilized for sports fishing will greatly reduce the degree of impact.

The impact on water quality is generally considered minimal and of a temporary and short-lived nature. This same assessment holds true for nektonic organisms which, due to their mobility, can easily avoid dredging activities and feed elsewhere.

The Corps deemed the physical removal and/or burial of benthic organisms by dredging a significant impact on these organisms but concluded that such impact would be limited to a small area in comparison to the vastness of the water bottoms involved. The Corps ascertained that heavy loads of siltation will harm live oyster beds, but found that any possibility of harm to live oyster beds could be alleviated by use of proper dredging techniques to assure that the turbidity plumes are carried away from the beds by currents, wind and gravity.

Finally, the Corps determined that the trenches left by dredging have no effect on directing storm surges toward the mainland.

*Lakes Area*

The shells dredged in the Lakes Area (LA) are primarily clam, or *rangia cuneata*. These fossil clam shells, unlike oyster shells, are not attached to one another in reef formations. The nature of the operation and equipment used in dredging this area is somewhat different than that used in the GCA, but the effect on the water-bottom is similar: a shallow trench about two feet deep and four to five feet wide. Lakes Pontchartrain and Maurepas are low salinity estuaries which together cover an area of approximately 723 square miles. The lakes are connected to one another through Pass Manchac and North Pass; Lake Pontchartrain connects with the Gulf of Mexico through the Rigolets, Chef Menteur Pass, Lake Borgne, the Mississippi Sound and several manmade waterways.

The lakes are highly turbid and the beds are predominantly silty clay. Marsh ranging from freshwater to brackish, with cypress-tupelogum swamp and urban areas surround Lake Pontchartrain; freshwater marsh and cypress-tupelogum swamp surround Lake Maurepas.

Thirty-six types of vegetation, including various marsh grasses, bald cypress and drummond red maple are indigenous to the area. A 1976 study relied on by the Corps lists 82 types of vertebrae and invertebrate collected in the LA. Among these are various types of mussels, clams and oysters, five types of shrimp, and numerous types of both saltwater and freshwater fish. A 1962 study noted by the Corps states that only four organisms maintain large resident populations in the Lake Area: anchovy, brackish water clams, mud crab and calanoid copepod. Of the clams, *rangia cuneata* is the most abundant.

Migratory waterfowl, such as scaup, mallards and coots as well as other birds reside in the LA. The marsh and swamp areas are inhabited by raccoon, oppossums, rabbit, nutria, muskrat, mink, white-tailed deer and squirrels.

The 1984 LA EA specifically addresses the impacts of shell dredging on nektonic and benthic organisms, vegetation, and water quality.

As in the coastal waters, the Corps found that the impact on nektonic organism in the LA is not significant due to the ability of these organisms to avoid dredging activity. Since dredging is prohibited in Lake Pontchartrain in areas shallow enough to support growth and Lake Maurepas is devoid of rooted submerged vegetation, the Corps found no impact on vegetation.

However, as in the GCA, the Corps discerned an adverse impact on the benthos of the LA attributable to dredging. The benthic organisms which are in the direct path of the dredge will be smothered by the discharge. In some instances, mud also flows outside the dredged cut. Nevertheless, the Corps does not consider the impact on the benthic community to be significant because the effects are temporary and short term. To a great extent, the finding of a less than significant effect on the benthos of the LA is grounded on the premise that the major adverse impact occurred 25–30 years ago.[11]

---

11. In our earlier opinion, we stated that it was appropriate to take into consideration the *status quo* of the environment in the affected areas. 596 F.Supp. at 654 n. 10 (citing *Sierra Club v. Hassell*, 636 F.2d 1095, 1099 (5th Cir.1981). In particular, we focused upon the 1984 LA EA which summarized various reports as concluding that the diversity of the benthic community that existed in Lake Pontchartrain in the 1930's (when dredging commenced) was lowered decades ago. On appeal, the Fifth Circuit stated that *Hassell* was inapposite to the case at bar and that its logic could not be utilized for the purposes of ascertaining whether the Corps was reasonable in concluding that the effect of dredging on benthic life in Lake Pontchartrain was insignificant. As the Fifth Circuit stated, "[t]he fact that much damage to the benthic life occurred years ago does not automatically render the effect of the continued dredging insignificant." *State of Louisiana v. Lee*, 758 F.2d at 1086. The Fifth Circuit emphasized that "[t]he renewal of these permits will not maintain a status quo, but rather will *continue* a course of environmental disruption begun years ago." *Id.* (emphasis added).

The impacts to the water quality of Lake Pontchartrain associated with turbidity created by dredging is also considered minimal by the Corps. The Corps' conclusion is predicated upon the size, depth, volume and tidal action of the water body. Because of its smaller dimensions, a naturally occurring imbalance of the carbon-nitrogen-phosphorous ratio, seasonally high temperatures, low flushing rate and fresher water, that above proposition does not hold true for Lake Maurepas. Due to a combination of these factors, there is a "potential for the occurrence of a stressful system-wide event" in Lake Maurepas.

For this reason, the Corps recommended in the LA EA that dredging in Lake Maurepas be discontinued until a monitoring program designed to detect the onset of potentially unacceptable situations and a method of greatly minimizing the turbidity plumes can be implemented.

The Corps concluded that the so-called "dead zones" discovered in Lake Pontchartrain and the contaminants found in them are unrelated to shell dredging.

## IV. A CONSIDERATION OF THE RESTRICTIVE CONDITIONS[12]

As noted in our earlier opinion, Col. Lee, the District Engineer and ranking officer for the New Orleans District of the Corps, concludes that for both areas, the LA and the GCA, the effects of dredging are not significant, given the conditions which are imposed on the dredging permits. For instance, he finds in regard to the GCA:

Although there are adverse impacts associated with shell dredging, the special conditions and other restrictions placed on the operations have reduced them to such extent that an environment impact statement is not required. No Federal resource agency indicated that the expected impacts are of enough significance to require preparation of an environmental impact statement.

GCA Revised Findings of Fact, p. 7

Similarly, in regard to the LA, Col. Lee concludes:

While it is recognized that shell dredging does cause impacts, my findings, based in part on my staff's review of all available studies and literature, does not indicate the impacts are of enough significance to require preparation of an environmental impact statement. I find the impacts of the shell dredging operations under the conditions of the permits to be not significant.

LA Revised Findings of Fact, pp. 7–8.

It is the position of both the Federal Defendants and the Defendants-In-Intervention that the restrictive conditions imposed in the permits obviates against the need for an EIS. In our earlier opinion, we acknowledged that "[i]t [was] undisputed that the effects of dredging [were] environmentally significant, when *not* tempered by the restrictions set out in the permits." *State of Louisiana v. Lee*, 596 F.Supp. at 655. The legal issue which then had to be resolved was whether the Corps could consider the conditions imposed in ascertaining the "significance" of the proposed action. *Id.* This court ultimately concluded that a consideration of the restrictive conditions imposed in the permits would not be inconsistent with the policies of the NEPA. *Id.* at 656. This court could discern "no valid reason to disregard the conditions imposed by the Corps [or] those imposed by various state agencies.[13] To do so [would be] to ignore the realities of the proposed action and require an EIS because of the effects posed by a 'hypothetical' project, rather than the effects of the actual proposal." *Id.* On appeal, Plaintiffs contended that this court erred in considering the restrictive conditions in reviewing the Corps' decision. *State of Louisiana v. Lee*, 758 F.2d at 1082. The Fifth Circuit, however, disagreed, finding that "the only realistic

---

**12.** The following summation tracks that evinced in our original opinion at 596 F.Supp. at 655.

**13.** As pointed out in our earlier opinion, the Louisiana Department of Natural Resources and

Wildlife and Fisheries Commission have imposed conditions on the permits and leases required by state law. 596 F.Supp. at 656 n. 14.

course of action is to consider the conditions in reviewing the Corps's decision not to file the impact statement." *Id.* at 1083.

■ Having concluded that this court may properly consider the restrictive conditions in the permits in reviewing the Corps's decision not to file an EIS, the issue which remains to be resolved on reconsideration is the reasonableness *vel non* of the Corps's "no significant effect" determination. *State of Louisiana v. Lee,* 596 F.Supp. at 656.

■ As pointed out earlier, the Fifth Circuit stressed that in the instant case, "[P]laintiffs must establish only that the Corps was unreasonable in concluding there was no reasonable possibility that the proposed action would significantly degrade any environmental factor." *State of Louisiana v. Lee,* 758 F.2d at 1085. Thus, the "certainty" standard utilized by this court in its earlier opinion, which required Plaintiffs to prove a significant degradation of some environmental factor actually *would* result from dredging, has been superseded by a "possibility" standard, which requires Plaintiffs to prove only that a significant degradation of some environmental factor *may* result from dredging.

## V. IMPORTANT GUIDELINES FROM THE FIFTH CIRCUIT

In the course of reviewing the record in the instant case on appeal, the circuit court

noted that the myriad differences between the 1982 and 1984 EAs raised questions. While the circuit court reached no conclusion as to the validity of the 1984 EA, it reminded this court "that, to some extent, the 1984 assessment is a '*post hoc* rationalization and thus must be viewed critically.' " *Id.* (citation omitted). The circuit court then instructed this court to "compare the projected ecological status of the affected areas if the dredging is continued for another five years with their projected condition if the dredging is halted now." *Id.* at 1086.

## VI. SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD[14]

Following remand of this matter from the Fifth Circuit, the court held a status conference to determine further disposition of this case. In a Minute Entry [ME July 25, 1985], the court directed the Federal Defendants to supplement the administrative record with affidavits from the Corps, specifically addressing:

(1) Why there exists a substantial divergence in the 1982 and 1984 EAs, and,

(2) A comparison of the projected ecological status of the affected areas if the dredging is continued for another five years with their projected condition if the dredging is halted now.[15]

**14.** In *Save Our Ten Acres v. Kreger, supra,* the Fifth Circuit stated that the reasonableness inquiry is *not* necessarily delimited to consideration of the administrative record. "[S]upplemental affidavits, depositions and other proof concerning the environmental impact of the project may be considered if an inadequate evidentiary development before the agency can be shown." 472 F.2d at 467. (5th Cir.1973). *Accord, Save Our Wetlands, Inc. v. Sands,* 711 F.2d at 644 ("[u]sing the administrative record, the trial testimony, affidavits and depositions ..."). *See also, State of Louisiana v. Lee,* 758 F.2d at 1086, where the Fifth Circuit stated that nothing in its opinion was intended to intimate what decision this court should reach after applying the appropriate standard to the proof or whether this court may decide that *further proof* may be necessary. In *Fritiofson v. Alexander, supra,* the circuit court reiterated "that a court applying the reasonableness test may, in certain circumstances, receive and weigh evidence beyond

that in the administrative record ..., and should at least satisfy itself that the agency has taken a 'hard look' at the environmental concerns raised by the plaintiffs and the factors made relevant by the various regulations implementing NEPA." 772 F.2d at 1238. *Cf. Citizen Advocates for Responsible Expansion v. Dole,* 770 F.2d 423, 434 (5th Cir.1985). In *Dole,* the Fifth Circuit stated that the administrative record that the court must review is the administrative record in existence at the time the agency committed itself to a particular decision; studies, statements, opinions, reports, rationalizations or other assertedly relevant and non-duplicative evidence made or offered after the decision to forego preparation of an EIS, must be viewed critically and ordinarily cannot constitute part of the administrative record.

**15.** The court further ordered counsel to submit briefs on whether, if the court ultimately finds

On October 9, 1985, the court held another status conference, at which time it was determined that all parties should be accorded the opportunity to traverse the affidavits which had been submitted to the court subsequent to the remand of this matter from the Fifth Circuit.[16] The depositions pertaining to the conclusions reached by the affiants in their affidavits, as well as the bases for those conclusions were filed and the trial on the merits of the litigation was submitted on documents to the court.[17]

## VII. THE DIVERGENCE BETWEEN THE 1982 AND 1984 EAs—ACCORDING TO THE CORPS

In response to this court's directive, the Corps submitted supplemental affidavits by Laura J. Swilley[18] and Robert H. Bosenberg[19] in an effort to explain the divergence between the 1982 and 1984 EAs. Ms. Swilley's opinion is that when "read in context, the 1984 EAs are not inconsistent with the 1982 EAs. In large measure, the changes made, based upon the re-evaluation process, were for purposes of clarification for the non-scientific reader." Swilley affidavit, (8/20/85), at p. 27. Ms. Swilley goes on to state that the divergence exists because "the 1982 Section 404(b)(1) addressed impacts associated with the proposed project without conditions or restrictions. The 1984 Section 404(b)(1) con-

sidered the impacts associated with the proposed project heavily conditioned . . . Thus, any difference between the 1982 and the 1984 Section 404(b)(1) guidelines evaluations is based upon recognition of conditions imposed versus the impacts of dredging in the absence of those conditions." Id.[20]

Similarly, Mr. Bosenberg's view is that the differences exist because the 1982 404(b)(1) evaluations addressed impacts associated with the proposed projects without considering restrictive conditions, whereas the 1984 404(b)(1) evaluations took the restrictive conditions into consideration in addressing the impacts. Bosenberg affidavit, (8/20/85), at p. 26.

## VIII. COMPARING THE 1982 AND 1984 EAs

### The LA EAs

The 1982 EA states:

The most significant impact of shell dredging occurs during the dredging process whereby benthic organisms are disrupted by the dredging or smothered by the discharge.

1982 LA EA at p. 5.

In the 1984 LA EA, the above excerpt was rewritten to read as follows:

the impact on the benthic organisms is not considered to be significant because

---

that the Corps' decision not to order an EIS was unreasonable, the court should grant injunctive or other equitable relief, and if so, what form of relief would be appropriate under the circumstances of this case.

16. Plaintiffs were allowed to depose Laura J. Swilley, Robert H. Bosenberg, Lloyd F. Baehr, Roger D. Swindler, Stephen E. Steimle and Maureen M. Mulino. Defendants were allowed to depose: Walter B. Sikora, Herman Edward Daly, Rodney Adams, Bruce Alan Thompson, and Rezneat M. Darnell.

17. The court established a briefing schedule, after which time the matter was to be considered under submission.

18. Ms. Swilley is an Environmental Resource Specialist with the Corps, New Orleans District. One of her duties is to prepare EAs in connection with the processing of permits issued pursuant to the Rivers and Harbors Act of 1899 and

the Clean Water Act. Ms. Swilley took part in preparing both the 1982 and 1984 EAs. In fact, she exclusively authored the 1982 EAs.

19. Mr. Bosenberg is an Environmental Resource Specialist with the Corps, New Orleans District. Like Ms. Swilley, one of his duties is to prepare EAs. He took part in preparing the 1984 EAs and conducting the 1984 404(b)(1) evaluations. However, the 1982 EAs and the 1982 404(b)(1) evaluations were completed prior to his affiliation with the Corps.

20. The Section 404(b)(1) guideline evaluations referred to were appended to and made part of both the 1982 and 1984 EAs. Section 404(b)(1) evaluations are in the form of a questionnaire, in which the Corps responds to various questions concerning the effects of the proposed activity.

the effects are temporary and short term.

1984 LA EA at p. 9.

In the 1982 LA EA, extensive dredging over a long period of time was deemed "quite harmful to the ecological health of the system." 1982 LA EA at p. 6.

The above excerpt was deleted entirely from the 1984 LA EA.

In the 1982 LA EA, it was noted that:
[t]he rapid depletion of the fossil shell represents an irreversible and irretrievable impact....

1982 LA EA at p. 8.

In the 1984 LA EA, the above notation was rewritten as follows:
[r]eduction (depletion) of fossil shell is not a significant biological impact.

1984 LA EA at p. 9.

In the 1982 LA EA, the Corps stated:
[i]f it is decided to go ahead and complete the demise of the ecological system of Lake Pontchartrain by continuation of the practices of dredging, pollution and marginal marsh destruction, then that is a human decision we will have to live with.

1982 LA EA at p. 6.

The 1984 LA EA deleted the above statement in its entirety.

In the 1982 LA EA, it was acknowledged that Mr. Sikora concluded that:
hydraulic shell dredging had significant effects on the nutrient and heavy metal chemistry of the water and sediments of Lake Pontchartrain.

1982 LA EA at p. 9.

In the 1984 LA EA, there is no specific reference to the above conclusion reached by Mr. Sikora.

*The GCA EAs*

In the 1982 GCA EA, it was stated that "[t]here would be significant impacts to sportfishing." 1982 GCA EA at p. 6.

In the 1984 GCA EA, the above statement was altered to read as follows:

"[t]here could be adverse impacts to sportfishing." 1984 GCA EA at p. 13.

In the 1982 GCA EA, the Corps acknowledged that:
[h]eavily utilized sportfishing areas could be damaged by shell dredging, as the specific exclusions listed in the dredging permit applications do not adequately safeguard these areas.

1982 GCA EA at p. 6.

In the 1984 GCA EA, the above excerpt was altered, and the Corps now stated that the specific exclusions "would greatly reduce any adverse impacts to sportfishing and shrimping." 1984 GCA EA at p. 13.

In the 1982 GCA EA, the Corps stated that:
[t]he physical removal and/or burial of benthic organisms will be a significant impact to these communities, ...

1982 GCA EA at p. 7.

In the 1984 GCA EA, the above excerpt was rewritten to read as follows:
[t]he physical removal and/or burial of benthic organisms will result in temporary adverse impacts to these communities, ...

1984 GCA EA at p. 13.

Finally, both the 1982 LA and GCA EAs acknowledge that:
[t]he impacts associated with [the] alternative[s] [i.e., the restrictive conditions imposed] would be the same as the proposed plan [i.e., without the restrictive conditions imposed] except for the time difference.[21]

1982 LA EA at p. 7; 1982 GCA EA at p. 10.

The above excerpt was deleted entirely from both the GCA and LA EAs in 1984.

## IX. A LOOK AT THE FIVE YEAR PROJECTIONS

In regards to a comparison of the projected ecological status of the affected areas if the dredging is continued for another five years with their projected condition if the dredging is halted now, the

---

**21.** The time difference refers to a proposed permit limitation which was not imposed but which would have restricted the permits to a period of less than five years.

Corps submitted affidavits by Robert H. Bosenberg and Lloyd F. Baehr.[22]

Mr. Bosenberg, limiting his discussion to Lake Pontchartrain, stated that given existing data, any differences that could arise during a five-year span with or without shell dredging would "probably be minimal and probably be related to factors largely if not wholly unrelated to shell dredging." Bosenberg, second affidavit, (8/20/85), at 8. Mr. Bosenberg adds, however, that over a twenty to forty year span, assuming other influencing factors are operative, "it is possible that a benthic community different from the one that exists today could arise. However, ... just how much difference may arise, is limited by the lack of sufficient quantitative evaluations and would thus need to be based on a theoretical perspective." *Id.* Mr. Baehr concurred with Mr. Bosenberg's assumptions and conclusions.

The Corps also submitted the affidavit of Roger D. Swindler[23] pertaining to a comparison of the 1982 and 1984 conditions as set forth in the 1982 and 1984 approvals. Mr. Swindler states that "the conditions included in the 1984 permits are a refinement of previous conditions and in some cases ... present significant addition to previous conditions." Swindler affidavit, (8/20/85), at p. 8. Mr. Swindler's opinion is that "the 1984 Federal and state conditions are sufficient to mitigate any significant impacts associated with shell dredging in the affected areas." *Id.* at p. 9.

Plaintiffs submitted supplemental affidavits by Walter B. Sikora[24] and Rezneat M. Darnell[25] directed toward projecting the ecological status of the affected areas both with and without dredging over a five-year period. Dr. Sikora states that "it is not unreasonable to assume, and in fact it is probable, that cessation of shell dredging in Lake Pontchartrain would lead to a reversal of the documented ecological deterioration this ecosystem has been subjected to ... Conversely, it is reasonable to assume that if dredging continues over the next five years as it has previously, then all of the deleterious effects ... will be exacerbated." Sikora affidavit, (9/12/85), at p. 7.[26]

In his affidavit, Dr. Darnell strongly disagrees with Mr. Bosenberg's opinion[27] that

22. Mr. Baehr is employed as the Chief of the Regulatory Assessment Section of the Corps, New Orleans District. He is the supervisor of Environmental Resources Specialists and Botanists in this section. One of his duties is to assign and review EAs and environmental impact statements prepared in connection with the processing of permits issued pursuant to the Rivers and Harbors Act of 1899 and the Clean Water Act.

23. Mr. Swindler is employed as Chief of the Permits Section with the Corps, New Orleans District. He prepared the 1984 time extension approvals to the six shell dredging permits; these approvals enumerate the various conditions placed on the shell dredging permits.

24. Dr. Sikora is a marine ecologist, currently an assistant professor at the Center for Wetland Resources at Louisiana State University. In connection with his studies in the field of marine ecology, he has worked extensively in the areas of Lake Pontchartrain and Gulf of Mexico, focusing primarily on benthic organisms. Dr. Sikora was once retained by the Corps to conduct a study of the impacts of shell dredging in Lake Pontchartrain; he was, in fact, the lead author of the Corps' studies of shell dredging in Lake Pontchartrain, in 1981.

25. Dr. Darnell is a Professor in the Department of Oceanography at Texas A & M University; his particular areas of interest are coastal and marine ecosystems. Dr. Darnell has never conducted a study of the environmental impacts of shell dredging on Lake Pontchartrain. Darnell deposition, (11/20/85), vol. 2, pgs. 278–279.

26. In the supplemental memorandum submitted in support of their motion for summary judgment, the Corps pointed out that in Dr. Sikora's June 1981 study, *Environmental Effects of Hydraulic Dredging for Clam Shells in Lake Pontchartrain, Louisiana,* Dr. Sikora reached contradictory conclusions on the projection issue. In his 1981 study, Dr. Sikora stated "it is not possible to predict, even if shell dredging operations were to cease, whether, or to what extent, the lake system would recover." As the Corps accurately points out, Dr. Sikora's conclusion in his 1981 benthic study is in accord with the cautious projection of Mr. Bosenberg noted earlier.

27. Dr. Darnell states that Mr. Bosenberg's arguments and conclusions are, in [his] opinion, either untrue or trivial." Darnell affidavit, (9/11/85), at p. 4.

there is no way to predict the ecological status of Lake Pontchartrain in five years if dredging is halted now. Relying on and extrapolating from a study of benthos recovery rates in San Antonio Bay, Texas,[28] Dr. Darnell calculates that if dredging were halted now, "that after five years in the dredge cuts themselves the recovery from the dredged condition would be 39% in terms of the numbers of bottom animals and 33% in terms of the weight of the animals." Darnell affidavit, (9/11/85), at p. 3. Conversely if dredging were allowed to continue, Dr. Darnell states that either the ecological status of the Lake "would be about as bad as it is now, i.e., with the bottom as flocculent gel incapable of supporting significant populations of bottom dwelling organisms useful as food for fishes, shrimp, and crabs ... [or] the gel [c]ould thicken and deepen and spread to the few remaining areas which can still support useful marine life." *Id.*

A review of the above excerpts reveals that there is a substantial divergence of opinion among the experts as to projecting the ecological status of Lake Pontchartrain. Moreover, there is disagreement among the parties as to why there is a divergence between the 1982 and 1984 EAs. As noted earlier, Ms. Swilley ascribes the divergence between the 1982 and 1984 § 404(b)(1) evaluations to the fact that "the 1982 Section 404(b)(1) addressed impacts associated with the proposed project without conditions or restrictions." Swilley affidavit, (8/20/85), at 27. Plaintiffs argue that Ms. Swilley's statement must be wrong because the conditions and restrictions were already there and had been there at least since 1977. Plaintiffs further note Ms. Swilley's deposition testimony where she admitted that she knew of the restrictive conditions *prior* to begin-

ning work on the 1982 EA. (citing Swilley deposition Vol. 2, (11/19/85), at p. 134). Finally, both the 1982 LA and GCA EAs themselves note that the impacts would be the same even with the restrictive conditions imposed. (See Sec. VIII *supra* at p. 24 comparing EAs.)

In sum, it appears that the parties agree solely on disagreeing and that this court has become a forum for a battle of the experts.

■ In light of the vehement disagreement as to why there is a divergence between the 1982 and 1984 EAs, this court concludes that its initial finding that *both* the 1982 and 1984 EAs are relevant and pertinent to the present inquiry is correct.[29]

## X. VIEWING THE 1984 EAs IN ISOLATION

*Lakes Area*

As noted earlier, there are restrictive conditions imposed in the LA permits which prohibit dredging in Lake Maurepas until a monitoring system program approved by the Corps (New Orleans District) is utilized to detect the onset of potentially unacceptable situations relative to turbidity.

In regard to the impact of shell dredging on the benthos of Lake Pontchartrain, the Corps concedes that shell dredging disrupts the benthos in the direct path of the dredge and that some benthic organisms outside the dredged areas may be affected by the discharge. In fact, the 1984 LA EA states that:

> the benthos in the direct path of the dredge are disrupted by the dredging or discharge ... In some instances, the mud may flow outside the dredged area and form a layer which could suffocate the benthos outside the dredged (direct impact) area. It is possible that some mol-

---

**28.** In the supplemental memorandum submitted in support of their motion for summary judgment, the Corps noted Dr. Sikora's deposition testimony that an extrapolation from or a comparison of, benthos recovery rates from San Antonio Bay to Lake Pontchartrain is neither sound nor appropriate. Sikora deposition, (11/12/85), at pp. 241–43.

**29.** The Corps submits that notwithstanding the Fifth Circuit's suggestion that the difference between the 1982 and 1984 EAs raised questions, the focus should remain on the 1984 EAs, since those documents constitute the agency's ultimate decision on reissuance of the permits. As noted above, the Court finds that *both* the 1982 and 1984 EAs are relevant.

lusk species may be too heavy to be supported by the loose unconsolidated layer and may sink and smother. Worms and other burrowing organisms are very sensitive to particle size and the changes caused by the dredging would temporarily reduce their habitat in the dredged area ...

1984 LA EA at pp. 6–7.[30]

The 1984 LA EA goes on to point out and stress, however, that the impacts on the benthic community are temporary and short-term. As stated by Mr. Bosenberg, "[t]he impact on the benthic organisms is not considered to be significant because the effects are temporary and short-term." Bosenberg affidavit, (8/20/85), at p. 10. However, the mere fact that the effects are short-term and of a temporary nature, do not suffice, standing alone, to reduce the effects below the threshold of significance.[31] See 40 C.F.R. § 1508.27(b)(7).

As additional support for their finding of no significant impact, the Corps stresses (as does the 1984 LA EA) that the reduction and diversification of benthic species occurred during the first twenty years of shell dredging and that now, the hardiest benthos are being maintained in a status quo. The Corps relies upon the conclusion of Sikora, Sikora and Prior that the benthic community was reduced by dredging that occurred prior to 1954, in support of its "finding that the continuation of shell dredging does not have a significant impact on the benthic organisms since the major adverse impacts on such organisms occurred 25–30 years ago [and] ... that the lake benthos is currently being maintained in a state of equilibrium by shell dredging." 1984 LA EA at pp. 7–8.

In our earlier opinion, this court found that the Corps was reasonable in concluding that "given the environmental status of Lake Pontchartrain, the effect on the present benthic community is insignificant." *State of Louisiana v. Lee*, 596 F.Supp. at 657 (citing *Sierra Club v. Hassell*, 636 F.2d at 1099). However, as noted earlier, the Fifth Circuit stated that *Hassell* is inapposite.[32] The Fifth Circuit emphasized that:

[t]he renewal of these permits will not maintain a status quo, but rather will *continue* a course of environmental disruption begun years ago. The fact that much damage to the benthic life occurred years ago does not automatically render the effect of the continued dredging insignificant. *State of Louisiana v. Lee*, 758 F.2d at 1086. (emphasis added).

In view of the foregoing, the court finds that the environmental impacts on the benthic community are not reduced below the significance threshold merely because of the fact that the effects are temporary and the major adverse impacts occurred years ago.

*Gulf Coast Area*

The restrictive conditions imposed on dredging in the GCA reflect the concern of shell dredging effects on exposed oyster reefs, sportfishing, and the emerging Atchafalaya Delta. For example, dredging is prohibited within 1,000 feet of exposed oyster reefs and within 1,500 feet of any shoreline, and in specific areas heavily fished by sportsmen.

In regard to the adverse impacts on benthic organisms located near or in the path of the dredge, the Corps properly took into consideration the limited number of benthic organisms affected in comparison to the vast area involved in reaching their conclusion of no significant effect. The court finds the Corps' conclusion reasonable in this regard since the C.E.Q. NEPA

---

**30.** The 1982 Lake EA stated that "[t]he most significant impact of shell dredging occurs during the dredging process whereby benthic organisms are disrupted by the dredging or smothered by the discharge." *Id.* at p. 5.

**31.** This was clearly set forth in our earlier opinion at 596 F.Supp. at 657.

**32.** The Corps continues to assert that the determination of significance can be qualified by the status quo of the ecosystem being evaluated. Post-remand, the court finds this contention is without merit.

guidelines indicate that in making the significance determination, it is proper, under certain circumstances, to consider the broad context in which the effect takes place. 40 C.F.R. § 1508.27(a).

With regard to possible adverse impacts on the delta formation, the 1984 GCA EA acknowledged that "[d]redging in the developing Atchafalaya Bay Delta *may* seriously impact the formation of the delta mainly through the loss of shallow water and accelerated erosion ... [and] [p]reliminary assessments from studies on Atchafalaya delta building indicate that ... shell dredging, *apparently* interferes with processes associated with the distribution of sediment within the delta complex." 1984 GCA EA at p. 11. (emphasis added).

In an effort to minimize shell dredging effects in the deltaic region, dredging is prohibited in a well-defined area near the Atchafalaya River Delta and the Wax Lake Outlet Delta. Specifically, dredging is barred within waters that are - 2 feet NGVD [33] and shallower around the Lower Atchafalaya River outlet delta and the Wax Lake outlet delta.

Notwithstanding the - 2 NGVD depth restriction imposed in the shell dredging permits, the court finds that the *possible* direct significant environmental effects, at least to the delta region of the GCA, were apparent when the 1984 EA was issued. When that EA was issued, the Corps was

cognizant of the May 2, 1984 affidavit of geologist Rodney Adams, Assistant Director of the Center for Wetland Resources, at L.S.U. Adams' affidavit specifically noted the inadequacy of the Corps' dredging restrictions based on the study and mapping of the land growth in the Atchafalaya Delta done by Mr. Adams and his colleagues. In fact, Mr. Adams' studies indicate that the - 2 NGVD restriction still permits dredging to occur in the path of land growth in areas which will become land by the end of this century. *See* Adams affidavit, (5/2/84), at p. 9.

In summary, the court finds that in regard to the LA, the Corps was unreasonable in concluding that there was no reasonable possibility that shell dredging in the affected areas "would significantly degrade any environmental factor." *State of Louisiana v. Lee*, 758 F.2d at 1085. Even after considering the 1984 LA EA in isolation, this court has found that there *may* be significant and direct environmental effects on *at least* the benthic organisms in the affected areas.[34]

With regard to the GCA, the court finds that while the Corps may disagree with Mr. Adams' conclusions pertaining to the effects of shell dredging on the Atchafalaya River Delta, the Corps was unreasonable in concluding there was no reasonable possibility that shell dredging in the GCA would significantly degrade the delta building

---

**33.** National Geodetic Vertical Datum—Dr. Swindler testified NGVD "basically means sea level. Its more precise." *See,* Swindler deposition, (11/21/85), at p. 82. The technical definition of NGVD, according to the U.S. Geological Survey Water-Data Report LA–84–1 [hereafter Water-Data Report LA–84–1] is "a geodetic datum derived from a general adjustment of the first order level nets of both the United States and Canada. It was formerly called 'Sea Level Datum of 1929' or 'mean sea level' in this series of reports. Although the datum was derived from the average sea level over a period of many years at 26 tide stations along the Atlantic, Gulf of Mexico and Pacific coasts, it does not necessarily represent local mean sea level at any particular place." *See,* Water-Data Report LA–84–1 at p. 6.

**34.** While the court has discerned that shell dredging may cause significant *direct* environ-

mental effects on the benthic community, there are myriad indirect effects on other organisms. For example, as pointed out by Dr. Sikora, a reduction in benthic organisms means a reduction in the amount of food available for shrimp, crabs and bottom feeding fish. Sikora affidavit, (5/2/84), at p. 13. Another example of the "interwoven nature" of the impacts studied is the research indicating that the fluid mud zone created by shell dredging "smothers fish food, defeats photosynthesis and interferes with bottom feeding fish, shrimp and crabs." *Id. See also,* 40 C.F.R. § 1508.27(7), *supra,* n. 8, p. 1112. § 1508.27(7) provides that in making the significance determination, an important consideration is "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment."

process, at least in the absence of any convincing empirical data in the record to the contrary.[35]

██ Furthermore, notwithstanding the Corps' explanations for the divergence between the 1982 and 1984 EAs, this court finds that the 1984 EAs are, to a large extent, *"post-hoc* rationalization[s]" which cannot withstand critical scrutiny. *State of Louisiana v. Lee,* 758 F.2d at 1085 (citation omitted). Accordingly, this court finds that shell dredging in both the LA and the GCA *may* significantly degrade the quality of the human environment in the affected areas.

## XI. GIVEN A VIOLATION OF THE NEPA, HOW DO WE FASHION A REMEDY?

In light of the Corps' unreasonable action, this court must now consider what remedy is appropriate under the circumstances of this case.[36]

Plaintiffs submit that the appropriate relief for a NEPA violation is to order the violation rectified (e.g., order an EIS prepared) and to enjoin the activity in the interim. (citing *Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985). In the instant case, Plaintiffs seek to enjoin shell dredging operations while an EIS is prepared. It is Plaintiffs' contention that an immediate injunction against shell dredging until completion of the EIS would be the appropriate remedy.

The Defendants contend that Plaintiffs misstate the legal requirements concerning the appropriate form of equitable relief.

Both the Corps and the Defendants-in-Intervention (hereafter the "Companies") stress that there is no automatic right to injunctive relief once a NEPA violation is shown. Defendants emphasize that even in the context of a NEPA violation, the prerequisites for obtaining injunctive relief must still be met. They argue entry of an injunction is not an automatic right but rather a remedy the necessity of which must be demonstrated by Plaintiffs.

In *Environmental Defense Fund v. Marsh,* 651 F.2d 983 (5th Cir.1981), the Fifth Circuit cogently summarized its stance on appropriate remedies in the context of NEPA violations as follows:

> When a court has found that a party is in violation of NEPA, the remedy should be shaped so as to fulfill the objectives of the statute as closely as possible, consistent with the broader public interest. *An injunction of the federal action at issue is often appropriate, but the injunction should be limited by general equity principles.* One beneficial effect of such injunction is to maintain the *status quo* so that the relevant decision makers and the public may still have the opportunity to choose among alternatives, as required by NEPA. Another purpose is to provide the agency with an incentive to comply with NEPA in as rapid and thorough a manner as is reasonably possible. The court should tailor its relief to fit each particular case, *balancing the environmental concerns of NEPA against the larger interests of society that might be adversely affected by an overly broad injunction....*[37]

---

**35.** The 5/2/84 affidavit of Rodney Adams (*see supra,* p. 34), together with the 5/2/84 affidavit of Dr. Walter B. Sikora, setting forth Dr. Sikora's conclusions that a serious impact in the formation of the delta "would also be highly destructive of what [he] found to be waters that are highly productive of marine life" were both filed with the court and served on the Corps by the Plaintiffs herein in May of 1984. *See,* Sikora affidavit, (5/2/84), at p. 8. Though the 1984 EA (the *revised* environmental assessment) concerned the precise issues which are the subjects of these two affidavits, the revised environmental assessment in no way cites these affidavits, discusses them, or even lists them in the ex-

panded list of references. *See,* affidavit of Nicholas C. Yost, (8/17/84), at p. 7.

**36.** As noted, the court ordered counsel to submit briefs pertaining to the appropriate form of relief if the Corps' action was ultimately found to be unreasonable. *See, supra* note 15 at p. 1116.

**37.** The CEQ NEPA regulations provide that until an EIS is prepared, no action is to be taken concerning the proposal which would (1) have an adverse environmental impact *or* (2) limit the choice of reasonable alternatives. 40 C.F.R. § 1506.1(a). *Marsh* makes it clear, however, that while injunctive relief is often appropriate,

*Marsh*, 651 F.2d at 1005–06. (emphasis added).

▮ In view of this court's finding that the Corps was unreasonable in not requiring an EIS on the LA and GCA from shell dredging, "[t]he most important remedy available is that the Corps must immediately prepare a[n] ... EIS covering [both the LA and GCA] ... The EIS must comply with all the requirements of NEPA, both procedural and substantive." *Marsh*, 651 F.2d at 1006.

## XII. IS INJUNCTIVE RELIEF AUTO-MATIC?

In *Marsh, supra,* Plaintiffs brought suit claiming that the Corps violated several statutes and regulations in the course of planning and constructing a major water project. In addressing the propriety of injunctive relief for the alleged statutory violations, the Fifth Circuit stated that it was appropriate to impose some injunctive relief until a supplemental EIS was filed in an effort "to encourage rapid and thorough compliance with NEPA." *Marsh*, 651 F.2d at 1006. In issuing injunctive relief, the circuit court delineated the precise boundaries of the injunction and found a blanket injunction of the entire project inappropriate.[38]

The Fifth Circuit in *Marsh,* supra, pointed out that the issuance of an injunction in the context of a NEPA violation, was limited by general equity principles. The Fifth Circuit has thus made it quite clear that there is no automatic right to injunctive relief whenever a violation of the NEPA is shown. In *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974), the Fifth Circuit recognized that the NEPA provided "a new statutory basis for injunctions against proposed actions that will have significant effects on the human environment if no environmental

impact statement [has] been filed." *Callaway*, 489 F.2d at 577–78 (citations omitted). Nonetheless, the circuit court noted that even in the context of litigation dealing with the failure to file an EIS, the prerequisite elements which had to be satisfied in order for preliminary injunctive relief to issue, had not been altered; therefore, the traditional tests for a preliminary injunction remain viable. *Id.* at 578.

In *Florida Wildlife Federation v. Goldschmidt,* 506 F.Supp. 350 (S.D.Fla.1981), the district court set forth the criteria which must be met before a preliminary injunction will issue. Plaintiffs must demonstrate:

1. a substantial likelihood that they will prevail on the merits;

2. a substantial threat that they will suffer irreparable injury if the injunction is not granted;

3. that the threatened injury to them outweighs the threatened harm the injunction may do to defendants; and

4. that granting the preliminary injunction will not disserve the public interest.

*Goldschmidt,* 506 F.Supp. at 353 (citing *Callaway, supra,* 489 F.2d at 572.).

In *Goldschmidt,* Plaintiffs sought a preliminary injunction to halt construction of a highway, asserting that the named Defendants had violated various statutes, regulations and Executive Orders in connection with the planning, design and construction of the highway. The district court noted that the Plaintiffs had urged that a showing of NEPA violations, standing alone, entitled them to a preliminary injunction. In response to Plaintiffs' argument, the district court stated that "[w]hether or not this is the law of the other circuits or other districts ..., it is clearly not the law in the

---

its issuance is still determined and limited by general equity principles.

**38.** In imposing limited injunctive relief, the circuit court acknowledged that it was "extremely reluctant to interfere with the construction of a project that Congress had authorized for the last ten years and that [was] now 55% complete.

But the Plaintiffs [had] established that the Corps [had] *blatantly* violated NEPA and its own regulations by refusing to prepare a supplemental EIS on the major changes [in the construction project] since 1971." *Marsh,* 651 F.2d at 1007.

Fifth Circuit." *Id.* at 353. The court emphasized that *Callaway* had made it abundantly clear that the usual standards for determining the issuance of preliminary injunctive relief apply with full force, even in the context of environmental litigation dealing with NEPA violations.

Plaintiffs herein argue that the issue now before this court, imposes a lesser burden of proof on them than that imposed for preliminary injunctive relief. In fact, Plaintiffs correctly point out that *Callaway, supra,* would guide this court's analysis only if the issue were one of preliminary injunctive relief (i.e., before a trial or pending appellate review). In the instant case, since the Plaintiffs have indeed prevailed on the merits (the Corps' actions have been found to be unreasonable), the issue of equitable relief is one of permanent, rather than preliminary injunctive relief.

In ascertaining the propriety of permanent injunctive relief, a court should consider:

(1) whether Plaintiff has succeeded on the merits;

(2) whether Plaintiff has an adequate remedy at law;

(3) the public interest;

(4) the balancing of equities.

*Southern Packaging v. United States,* 588 F.Supp. 532, 544 (S.D.S.C.1984). *See Nissan Motor Corp. v. Maryland Shipbuilding & Drydock Co.,* 544 F.Supp. 1104, 1122 (D.Md.1982); *La Duke v. Nelson,* 560 F.Supp. 158, 162 (E.D.Wash.1982); *Sierra Club v. Alexander,* 484 F.Supp. 455, 471 (N.D.N.Y.1980), *aff'd,* 633 F.2d 206 (2nd Cir.1980); *Lewis v. S.S. Baune,* 534 F.2d 1115 (5th Cir.1976).

It is important to point out that irreparable harm is *not* an independent prerequisite for obtaining permanent injunctive relief; however, it is often a basis for showing the absence of an adequate remedy at law. 11 Wright & Miller, Fed. Practice & Procedure § 2944 at 399–401 (1973); *Lewis v. S.S. Baune,* 534 F.2d at 1123–24; *Southern Packaging, supra,* 588 F.Supp.

at 544. Therefore, while irreparable harm is not an independent prerequisite for issuance of a permanent injunction, it nonetheless remains a viable criterion in ascertaining the adequacy of a remedy at law.

## INADEQUACY OF A REMEDY AT LAW—IRREPARABLE HARM

As Plaintiffs have prevailed on the merits, the court must next inquire into whether Plaintiffs have an adequate remedy at law. In *Lewis v. S.S. Baune,* the Fifth Circuit noted that "the essential prerequisite to a permanent injunction is the unavailability of an adequate remedy at law." 534 F.2d at 1124. One basis for demonstrating the inadequacy of a legal remedy is, as noted, a showing of irreparable harm.

Plaintiffs have cited numerous cases from the Sixth, Eighth and Ninth circuits in support of the proposition that there is a presumption or irreparable harm once a NEPA violation is shown. The Corps, on the other hand, contends that Plaintiffs cannot demonstrate the requisite irreparable harm, given the uninterrupted 50-year history of dredging in the affected areas.

As noted earlier, this court's conclusion that shell dredging in the LA and GCA *may* have significant effects on the environment was predicated upon a standard of possibility, not a standard of certainty. The Companies insist that "[a] showing that there 'may' be harmful effects from dredging is too speculative a basis upon which to issue an injunction, since the required showing of 'imminent' (as well as irreparable) harmful consequences has not been made."

For purposes of preliminary injunctive relief, an injury is deemed to be "irreparable" if it cannot be undone through monetary remedies. *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Unit B 1981). In the case at bar, if we utilize irreparable injury as being denotative of an inadequate remedy at law, it is clear that Plaintiffs do not have an adequate legal remedy, since the continued degradation and environmen-

tal disruption caused by shell dredging cannot be undone through monetary remedies.

## THE PUBLIC INTEREST

Having found that Plaintiffs have succeeded on the merits and have demonstrated the inadequacy of a remedy at law, the court must now inquire into whether Plaintiffs have demonstrated that granting the requested injunctive relief will not be adverse to the public interest. At the outset, it is important to note that there are several facets of the public interest involved in this case. Plaintiffs have "aligned themselves with the 'strong public interest embodied in the NEPA concerning the importance of agency consideration of environmental values.'" *Goldschmidt*, 506 F.Supp. at 372 (citations omitted). Apart from the public interest in the environment, there are other public interests at stake. The Companies represent the public's interest in preventing the demise of the shell dredging industry, the loss of jobs, the loss of capital investments and other adverse ramifications associated with the immediate cessation of shell dredging operations. In essence, the Companies voice concern over the harsh economic repercussions stemming from an injunction enjoing shell dredging operations. This facet of the public interest was manifest in *Richland Park Homeowners Association, Inc. v. Pierce*, 671 F.2d 935 (5th Cir.1982), where the Fifth Circuit noted that one rationale relied upon by the courts in concluding that plaintiffs are not entitled to relief is whether or not there are countervailing considerations of public interest which outweigh the value of the requested injunctive relief.

In *Pierce, supra,* the circuit court instructed that when faced with a request for injunctive relief based upon a NEPA violation, "[a] court must make a particularized analysis of the violations that have oc-

curred, of the possibilities for relief, and of any countervailing societal interests that might be adversely affected by the issuance of an injunction." *Pierce*, 671 F.2d at 942 (citations omitted).

■ In the case at bar, the violations of NEPA at issue concern the Corps' failure to prepare an EIS for the affected areas. The most obvious remedy available is, as noted, to order the preparation of an EIS for the LA and the GCA. Other possible relief is an injunction, enjoining the shell dredging operations pending preparation and completion of an EIS. While an injunction is often appropriate it is nonetheless limited by general equity principles. Any remedy imposed should be "shaped so as to fulfill the objectives of [NEPA] as closely as possible, consistent with the broader public interest." *Marsh*, 651 F.2d at 1005.

The Plaintiffs contend that the public interest favors injunctive relief in that alternatives to shell, such as sand, gravel, and limestone, are readily available and economically feasible. The Plaintiffs stress that a consideration of alternatives to shell is relevant to the present inquiry and is, in fact, one of the objectives to be illuminated by an EIS under the NEPA.[39]

In regards to the Plaintiffs' claim that alternatives to shell are economically feasible and readily available, the Companies insist that many of these factual assertions are without support. Specifically, the Companies juxtapose Plaintiffs' claim that limestone is an ideal source of calcium carbonate and a perfectly adequate substitute for shell, with the Declaration of Rodney Adams,[40] that "[s]hell, being of lower density is more suitable for road construction in some wet areas." Adams Declaration (undated) at p. 6. The Companies underscore the fact that the "wet" areas in which shell would be a more suitable road construction material would include almost all of south

---

**39.** Plaintiffs also point out that the CEQ NEPA Regulations describe the alternatives provision as the "heart" of the EIS. *See,* 40 C.F.R. § 1502.14.

**40.** As noted earlier, *supra* p. 1122, Mr. Adams is a geologist presently acting as the assistant di-

rector (Special Projects Office) at the Center for Wetland Resources at L.S.U. While Mr. Adams' declaration was submitted in support of Plaintiffs' Brief on the Subject of Relief, the Companies now rely upon it to buttress their position against the issuance of injunctive relief.

Louisiana. The Companies emphasize further that the substitution of limestone for shell in neither simple nor inexpensive since Louisiana presently produces no crushed limestone. *See,* Joint Memorandum in Opposition to Plaintiffs' Brief in Support of Injunction at p. 9 (citing Summary of United States limestone production contained in the 1983 Minerals Yearbook.) In regards to the suitability of gravel as a substitute for shell for road construction, the Companies point out that "its weight makes it unsuitable as an embankment material in south Louisiana soils." *Id.* (citing Arman, *Users' Manual for Shell and Limestone in Heavy Construction* (L.S.U. 1981), pgs. 19–22.

The companies insist that Plaintiffs have not demonstrated and are unable to demonstrate that it would be in the public interest for shell dredging to be enjoined while an EIS is prepared, since the record is replete with evidence that the public interest is served by allowing shell dredging operations to continue. In support, the Companies point out that their shell dredging operations, being approved via issuance of shell leases and coastal use permits by state agencies, are indicative of the state's determination that shell dredging operations are in the public interest. *See,* Louisiana Coastal Resources Management Act of 1978, La.R.S. 49:213.1 *et seq.* Moreover, the Companies point out that both the Corps' time extensions and the state coastal permits contain provisions which allow modifications or suspension of the permits if it is in the public interest. *See,* e.g., La.R.S. 49:213.16. Finally, and perhaps more importantly, the Companies focus upon the adverse economic impact which would result if shell dredging were enjoined pending preparation of an EIS.

In essence, the court is faced with the public's interest in the environment on the one hand, and the public's interest in preventing the demise of a 50-year old industry on the other. When faced with competing claims of injury, "the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between the competing claims ...." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Accordingly, this court must now proceed to the arduous task of balancing the equities involved in the case at bar.

### A BALANCING OF EQUITIES

■ One final element this court must consider in determining whether injunctive relief should issue, is the so-called balancing of the equities;[41] that is, the court must balance the injuries alleged by Plaintiffs against the harm which Defendants could incur if the injunction were granted. In the instant case, Plaintiffs point out that continued dredging means continued degradation in the affected areas. Plaintiffs note that the objectives of the NEPA are (1) to prevent or eliminate damage to the environment, and (2) to insure that Federal agency decisionmakers take environmental factors into account in the way that the statute mandates. *See,* 42 U.S.C. §§ 4321 and 4331. It is Plaintiffs' position that in light of the NEPA's objectives, the status quo must be maintained by injunctive relief while the Corps prepares an EIS in compliance with the NEPA.

The Companies contend that if shell dredging operations were allowed to continue while an EIS is being prepared, Plaintiffs would suffer no real injury. However, the Companies assert that if shell

41. The balancing of equities involved in fashioning a remedy for NEPA violations was clearly set forth by Chief Justice Burger in *Aberdeen v. Rockfish R.R. v. Scrap,* 409 U.S. 1207, 93 S.Ct. 1, 34 L.Ed.2d 21 (1972), when in denying an application to stay a preliminary injunction pending appeal, he made the following pertinent remarks:

Our society and its governmental instrumentalities, having been less than alert to the needs of our environment for generations, have now taken protective steps. These developments, however praiseworthy, should not lead courts to exercise equitable powers loosely or casually whenever a claim of "environmental damage" is asserted. * * * *The decisional process for judges is one of balancing and it is often a most difficult task.*
409 U.S. at 1217–18, 93 S.Ct. at 7 (emphasis added).

dredging operations are enjoined pending preparation of an EIS, they would suffer irreversible economic injury. Specifically, the Companies assert that any suspension of their operations for a period of 18–24 months (the estimated time needed to prepare an EIS of the affected areas) would have the practical effect of eliminating the shell dredging industry from the state of Louisiana. *See*, Supplemental Affidavits (8/20/85), of H. Donovan Ross [42] and George Douglass, Jr.,[43] and the Affidavit of Robin B. Durant,[44] each at p. 2.

The Companies insist that the affidavits of their representatives as well as the affidavit (8/22/84) of Dr. Kenneth Boudreaux,[45] a consulting economist, demonstrate that not only the shell dredging companies, but also the state of Louisiana, would suffer irreversible economic losses if shell dredging operations are enjoined. These losses would, say the Companies, manifest themselves in terms of capital investments, dismissal of the shell dredging companies' labor forces, loss of revenue to the state, loss of an income stream to secondary and consumer industries, and loss of a commercial product that plays a major role in the construction industry. *See*, Joint Memorandum in Opposition to Plaintiffs' Request for Injunctive Relief at pgs. 10–11.

In sum, it is the Companies' contention that Plaintiffs' are simply unable to demonstrate any potential harmful effects that they might endure as a result of the denial of injunctive relief which could outweigh the harmful effects that would most certainly occur to the Companies if injunctive relief is granted. *Id.* at p. 13.

▮▮ After thoroughly reviewing the affidavits proffered by the parties against the backdrop of the particular facts of this case, a balancing of the equities tips the scale in favor of the Companies, for the Plaintiffs have been unable to demonstrate that the threatened environmental harm to the affected areas if the injunction is denied outweighs the certain and concrete harm to the Companies if the injunction is granted. The Companies represent an industry that has been in existence for more than 50 years under the auspices of state law, and which has major economic impacts upon the state's economy and other secondary industries. Moreover, while the determination of "significance" cannot be qualified by the status quo of the ecosystem being evaluated, the status quo of the ecosystem is pertinent and indeed relevant in ascertaining the degree of environmental harm to the affected areas over the 18–24 month period needed to complete an EIS. Given the long history of shell dredging, any palpable changes caused by the cessation of shell dredging will occur regardless of whether the cessation is immediate or after the relatively brief period of time required for preparation of an EIS. On the other hand, severe socio-economic impacts are certain to occur if shell dredging was ordered stopped immediately. As stated in the supplemental affidavits submitted by the Companies' representatives, the shell dredging industry simply cannot withstand a cessation of operations from 1–3 years, and an injunction enjoining operations during such time would effectuate the demise of the industry in the State of Louisiana. The importance of this effect becomes magnified when viewed against the statement of Dr. Boudreaux [46] that "the shell dredging industry in Louisiana generates, directly or indirectly, in the neighborhood

---

**42.** Mr. Ross is the President of Dravo Basic Materials Company, Inc.

**43.** Mr. Douglass is the President of Pontchartrain Materials Corp.

**44.** Mr. Durant is the President of Louisiana Materials Company, Inc.

**45.** Dr. Boudreaux is a Professor of Economics at Tulane University.

**46.** Plaintiffs submitted the testimony of Dr. Herman Edward Daly, Alumni Professor of Economics at L.S.U., regarding an evaluation of the economic factors involved in the prohibition of shell dredging pending preparation of an EIS. However, Dr. Daly admitted that he "at no point in here did an empirical study of what are the actual numbers to be attached...." Daly Deposition, (11/13/85), at pgs. 96–97.

of $226,000,000 of economic transactions." Affidavit of Dr. Boudreaux at p. 1. While Plaintiffs have demonstrated that shell dredging *may* cause significant environmental impacts, the issuance of injunctive relief predicated on a possibility "would favor the tenuous and conjectural injuries" of Plaintiffs "over the specific, concrete certain and irreparable harm" that the Companies will incur if shell dredging is halted. *Goldschmidt*, 506 F.Supp. at 373.

This court, in exercising its sound discretion as a court of equity, must have particular regard for the public consequences in determining whether to employ the extraordinary remedy of injunctive relief. *Weinberger v. Romero-Barcelo*, 456 U.S. at 312, 102 S.Ct. at 1803. In the case at bar, an injunction triggering an immediate cessation of shell dredging operations pending completion of an EIS cannot be justified in striking a balance between the possible significant environmental impacts associated with shell dredging operations and the clearly predictable social and economic ramifications that would result from an injunction of those operations. *See, Reserve v. Mining Co. v. Environmental Protection Agency*, 514 F.2d 492, 536 (8th Cir.1975). However, in fashioning a remedy which fulfills the objective of the NEPA, *consistent* with the broader public interest, this court's order herein must provide the Corps with an incentive to comply with the NEPA in "as rapid and thorough a manner as is reasonably possible". *Marsh*, 651 F.2d at 1005–1006.

Accordingly, while this court will not at this time enjoin the shell dredging activities at issue, this court will order that the Corps shall neither renew nor extend the permits in question when they expire on December 31, 1987, unless prior to that date the Environmental Impact Statements ordered herein are completed.[47]

For the reasons set forth above;

IT IS ORDERED, ADJUDGED AND DECREED that the Defendant, the United States Army Corps of Engineers:

1. Prepare an environmental impact statement (or statements) which comply(ies) with all the NEPA requirements, both procedural and substantive, on the impact of shell dredging in both the Lakes Area and the Gulf Coast Area.

2. With regard to the Gulf Coast Area, the environmental impact statement or statements ordered herein shall, at a minimum, analyze the possible impact of shell dredging on:

   a. The emergence of the Atchafalaya Bay Delta;

   b. Water quality;

   c. Shell reefs;

   d. Sportfishing, storm waters in the Gulf of Mexico; and

   e. The exhaustion of the shell resource.

3. For the Lakes Area the environmental impact statement or statements ordered herein shall at a minimum ana-

---

**47.** Plaintiffs have failed to persuade the court that a cessation of all shell dredging operations is necessary to properly prepare the environmental impact statement or statements. *See, e.g., Weinberger v. Romero-Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). It should be noted there was no unanimity between two of Plaintiffs' own experts as to the proper form of interim relief. Dr. Sikora, for example, opted not to respond to the issue. *See* Sikora deposition, (11/12/85), at pgs. 235–38. Dr. Darnell, on the other hand, stated initially that if an EIS were ordered, shell dredging should be allowed to continue so that it could be studied at that time. *See* Darnell deposition, (11/20/85), at pg. 270. Later, in the course of his deposition, Dr. Darnell suggested that per-

haps shell dredging should be allowed to continue on a reduced scale, which he arbitrarily chose to reduce by 50%. *Id.* at pgs. 361–62. Nevertheless, if the Defendant Corps feels otherwise, i.e., some dredging must be halted or limited to certain geographical areas in order to properly prepare an EIS, it may impose additional permit conditions as required. While the court defers to the agency as to making this determination, i.e., what, if any, additional restrictive conditions are required to properly prepare the environmental impact statement or statements ordered herein, the court cautions that a flawed environmental impact statement will likely do nothing more than breed additional litigation. *See, e.g., Fritiofson v. Alexander*, 772 F.2d 1225 (5th Cir.1985).

lyze the possible impacts of shell dredging on:

a. The ecological health of Lake Pontchartrain;

b. The benthic fauna;

c. Vegetable material on the bottom;

d. Turbidity;

e. Water quality;

f. Fossil shell depletion;

g. Long-term pollution of the lake.

4. For both areas, i.e., the Lakes Area and the Gulf Coast Area, the Defendant, United States Army Corps of Engineers, shall take whatever steps it now deems necessary or it later deems necessary in preparing the environmental impact statement or statements to assure that adequate information is gathered to permit informed decision-making. Such steps might include but are not limited to issuing additional restrictions to the shell dredging permits previously issued in these areas; such restrictions might include a cessation of dredging for a specified period of time, a reduction in the number of dredges operating in any particular area for a specified period of time, or any other restriction the Corps deems necessary to assure compliance with this Order, i.e., the gathering of adequate information for preparation of an informed environmental impact statement or statements.

5. Neither renew nor extend shell dredging permits Nos. 183, 35, 56, 121, 130 and 241, until completion of the environmental impact statement or statements ordered herein.